J-A24012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 8 MDA 2018 |

Appeal from the Order Entered December 11, 2017
In the Court of Common Pleas of Dauphin County Civil
Division at No(s):  2017 MH 74

BEFORE:  OTT, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 21, 2018**

J.B. appeals from the order entered December 11, 2017, in the Court of Common Pleas of Dauphin County, that dismissed his petition for expungement of mental health records pursuant to 18 Pa.C.S. § 6111.1(g)(2).[1]  J.B. challenges the sufficiency of the evidence underlying his 2014 involuntary commitment pursuant to the Mental Health Procedures Act ("MHPA"), 50 P.S. § 7302.  Specifically, J.B. presents two questions for this Court's review: (1) Did the trial court commit an error of law by finding sufficient evidence for the warrantless taking of J.B. from his home where the applicant did not allege in the Section 302 Application any personal observation of a threat to commit suicide or an act in furtherance of a threat

_____

[1] Responsive briefs have been filed by the Pennsylvania State Police (PSP), Dauphin County Crisis Intervention (DCCI), and the Pennsylvania Psychiatric Institute (PPI).

to commit suicide?; and (2) Did the trial court abuse its discretion in determining that there was cause for immediate involuntary treatment where Part I of the Section 302 Application indicates that J.B., prior to arrival of police, placed his firearm in a locked safe?[2]  Based upon the following, we affirm.

The trial court summarized the facts presented at the December 1, 2017, hearing, as follows:

> Petitioner J.B. testified that, on the day of his [September 21, 2014] commitment, he had a Skype/text conversation with his wife about their marriage. At that time, his wife was engaged in an affair with [J.B.'s] employer and the wife and employer were on vacation together in Vancouver, British Columbia. Clearly they had previously left, as they were already there. [J.B's] wife told him that their marriage was over. At the end of their conversation, [J.B] said, "I'm done." When asked what he meant by that, he said he no longer wished to discuss anything with her, and there was nothing further to talk about. Wife must have taken a different interpretation based on his tone and expressed affect. So great was her concern that although she had ended their relationship, she tried to immediately reconnect with him numerous times. Failing to reconnect, she called the police. [J.B] testified that he had placed his phone in his pocket and it continued to vibrate with message notifications. There were many messages that came in that he did not respond to or read. About ten or fifteen minutes later, [J.B.] retrieved a firearm. [J.B.] testified that his firearms are normally kept in his safe, but the week prior he had been traveling so he left one accessible for his wife. He decided that he needed to put the firearm away since his son was coming home for the weekend. [J.B.] did not return the firearm directly to the safe, but instead sat down with it so that he could "think." There were four rounds in the magazine but none in the chamber. [J.B.] eventually returned the firearm to the safe. When asked if he

---

[2] J.B has withdrawn the third issue presented in his "Statement of the Questions."  *See* J.B's Brief at 4, 13.

thought about suicide, [J.B.] responded that the thought crossed his mind, but not with any level of seriousness.

[J.B.] eventually looked at his phone and saw that his wife had indicated that the police were on their way to his house. When the officers arrived, they banged on [J.B.'s] door. He opened the door to four individuals, was searched, and was asked if he had any weapons on him. [J.B.] had a small pocketknife on his person, no firearms. [J.B.] gave the officers the story about his wife and that their marriage being over. When asked about his possession of a firearm, [J.B.] said he told the police that it "was in my lap and summarily in my hand in order to get it down there." He was not presented with a warrant. When asked if he was taken to the hospital against his will, [J.B.] responded, "I inquired of the officers as to whether or not I had a choice in the matter, and I was informed that I did not, and so I would answer that question in the affirmative." He was not physically restrained during his ambulance ride, and was left alone in the back of the ambulance. A crisis counselor spoke with [J.B.] at the hospital in one of the rooms in the emergency department; they discussed the police report. [J.B.] eventually spoke with a doctor, who had a brief conversation with him. The police report made reference to the fact that a gun was in [J.B.'s] hand. [J.B.] testified that he wanted his mental health record expunged due to the stigma attached to mental health, and the loss of his career/income.

When asked if he recalled having [been] given the opportunity to change his commitment form from a 302 involuntary commitment to a 201 voluntary commitment, [J.B.] responded that he had been informed by the admitting nurse. [J.B.] took on that right and signed himself in voluntarily on the day following his admission to the Pennsylvania Psychiatric Institute.

Corporal Richard Needham, patrol supervisor at Lower Paxton Township, testified at the hearing. Corporal Needham was one of the officers called to [J.B.'s] home on September 21, 2014; the reason for dispatch was a suicidal male. As scene commander, Corporal Needham testified that the officers received the call from [J.B's] wife; she relayed that she thought [J.B.] was suicidal and that there was a firearm in the house. In such circumstances, the officers set up a perimeter around the house and attempt to verify the location of the person. In this case, the officers were able to verify that [J.B.'s] car was in the driveway of the home. [The] officers attempted numerous times to contact him via his cell

phone and house phone. Those attempts, which lasted for approximately 20 minutes, were unsuccessful. The officers then retrieved their "bunkers" (a shield to protect from projectiles) from their vehicles and peeked through the windows of the home. At some point, [J.B.] came out of the house on his own and was cooperative with the officers. Once he was outside of the house, Corporal Needham had a conversation with [J.B.]. Corporal Needham testified as follows:

> Once he exited his house there was a chair or bench on his front porch and he sat down. And he was emotionally upset, crying. And we were trying to ascertain the information that we received from his wife was accurate, you know, on account of what was going on in his life at the time.
>
> And he stated that he was upset, there was a lot going on, he was crying. And we asked him about the firearm and he said to me that he did have a firearm in his hand at one point and th[at] he wanted to shoot himself and he wanted to die.

Corporal Needham felt there was enough for a 302 commitment due to the statements [J.B.] made about harming himself, and Corporal Needham testified that [J.B.] agreed to go with the EMS via ambulance. Subsequently, Corporal Needham went to the hospital and signed an application for involuntary examination and treatment.

Trial Court Opinion, 4/17/2018, at 1-4 (record citations omitted).

At the conclusion of the testimony, with regard to the sufficiency of the evidence, J.B.'s attorney argued, *inter alia*, (1) there was no personal observation by police or a physician of any act or threat by J.B. in furtherance of suicide, to support the taking of J.B. without a warrant, and (2) J.B. was not in need of immediate involuntary treatment at any time. The trial court

thereafter issued an order dismissing J.B.'s petition for expungement. This timely appeal followed.[3]

"Our well-settled standard of review in cases involving a motion for expunction is whether the trial court abused its discretion." ***Commonwealth v. Smerconish***, 112 A.3d 1260, 1263 (Pa. Super. 2015), *quoting **In re Keyes***, 83 A.3d 1016, 1022 (Pa. Super. 2013). However, questions of evidentiary sufficiency "present pure questions of law, over which our standard of review is *de novo* and our scope of review is plenary." ***In re Vencil***, 152 A.3d 235, 241 (Pa. 2017), *cert. denied*, 137 S. Ct. 2298 (2017)

Pursuant Section 6111.1(g)(2) of the Uniform Firearms Act:

> A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged.

18 Pa.C.S. § 6111.1(g)(2).

We first consider J.B.'s claim that there was insufficient evidence to support Corporal Needham's taking him for an emergency examination without a warrant.

Under Section 301 of the MPHA:

> Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary

---

[3] J.B. timely complied with the order of the trial court to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

- 5 -

emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a). A clear and present danger may be demonstrated by the proof that, within the past 30 days, "the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide[.]"  50 P.S. § 7301(b)(2)(ii).  Furthermore, Section 7302 provides for taking a person for an emergency examination without a warrant:

Upon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, and physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.

50 P.S. § 7302(a)(2).

J.B. argues Corporal Needham testified that he acted on his personal interpretation of statements by J.B. of past thoughts of death.  J.B. asserts Corporal Needham did not allege any personal observation of an act in furtherance of a suicide threat, but rather explicitly relied on only statements of prior thoughts, which had passed at the time of Corporal Needham's arrival. J.B. maintains the mere thought of suicide is not contemplated by the MHPA as grounds for involuntary commitment.  J.B. states a strict reading of the plain language of the statute indicates that, at the very least, the person has "made threats to commit suicide" and has "committed acts which are in

furtherance of the threat to commit suicide." 50 P.S. § 7301(b)(2)(ii). Furthermore, J.B. posits "this thought was never relayed to anyone until after the thought had subsided and any conceivable act in furtherance had already been resolved by [J.B.'s] own volition." J.B.'s Brief at 18.

J.B. challenges the trial court's reliance on the statement J.B. made to Corporal Needham that he "had wanted to shoot himself," and on the retrieval of the firearm as the act in furtherance. J.B. argues the trial court thus explicitly relied on a thought that had occurred in the past. J.B. contends the trial court's acceptance of Corporal Needham's observation of distraught behavior as an act in furtherance is far too low a bar. J.B. further asserts the other perceived act in furtherance was resolved prior to any intervention as Corporal Needham did not personally witness a firearm in J.B.'s possession. J.B. maintains Corporal Needham observed a man who had resolved not to commit self-harm and had independently taken steps away from such act. J.B. concludes without a threat of harm or an act in furtherance of such threat — and without a suicide attempt — Corporal Needham did not have authorization TO take him from his home for emergency examination without a warrant.

The Pennsylvania State Police (PSP) takes the position that the mere fact that Corporal Needham's information was gleaned by J.B.'s admission, and not by his actually seeing the handling of the firearm, is immaterial and does not make the warrantless transport a violation of the MHPA. The PSP

maintains Corporal Needham observed conduct, both in what he saw in J.B.'s demeanor, as well as in J.B.'s remarks made directly to him. In support the PSP cites ***J.C.B. v. Pa. State Police***, 35 A.3d 792, 795-796 (Pa. Super. 2012), where this Court upheld a commitment that was based on the fact "Appellant had expressed his suicidal ideations and failed suicide attempt directly to medical personnel at Sewickley Valley Hospital."

The Dauphin County Crisis Intervention (DCCI) likewise counters J.B.'s argument, arguing J.B. ignores what Corporal Needham did observe — J.B.'s crying and emotional behavior and admission that he did have a gun in his hand before he arrived and that he wanted to shoot himself. DCCI points out that J.B. cites no authority in support of his position that a person has to be actively engaged in an act of furtherance, which is observed by police, in order to be subjected to an involuntary commitment. In support, DCCI relies on ***Commonwealth v. Smerconish***, 112 A.3d 1260 (Pa. Super. 2015), holding there was sufficient evidence for an involuntary commitment where, in the days leading up to police arrival at the individual's fraternity house, the individual had sent "instant messages" to his sister that he wanted to kill himself and also researched online painless ways of committing suicide. ***Id.*** at 1261-1262.

Pennsylvania Psychiatric Institute (PPI) likewise relies on ***Smerconish*** to argue against J.B.'s position. PPI argues the facts of this case are similar to ***Smerconish*** in that police were summoned to J.B.'s residence following a

report from J.B.'s wife following an exchange of Skype text messages; police could not make contact with J.B. because he would not answer his cellular and home phones; when police were able to get J.B. to come to the door, he was crying and admitted he had a gun in his hand at one point, wanted to shoot himself and die, but had put the gun back in the safe. PPI asserts J.B's argument that any suicidal thoughts which he may have had were resolved by his own hand, and therefore he was not in need of immediate treatment, is the same argument rejected in **Smerconish**.

Corporal Needham made the following written statement in the 302 Application:

> While speaking with [J.B.] he relayed to me that he had a loaded gun in his hand and wanted to kill himself with the gun. He placed the gun in his safe and then answered the door.

Commonwealth Exhibit 1, 302 Application, 9/21/2014, at 3 (Part I). Further, at the expungement hearing, Corporal Needham testified:

> Once he [J.B.] exited his house there was a chair or a bench on his front porch and he sat down. And he was emotionally upset, crying. And we were trying to ascertain that the information that we received from his wife was an accurate, you know, on account of what was going on in his life at the time.
>
> And he stated that he was upset, there was a lot going on, he was crying. And we asked him about the firearm and he said to me that he did have a firearm in his hand at one point and that he wanted to shoot himself and he wanted to die.
>
> … And in the course of that conversation he said that the gun was put back in the safe.

N.T., 12/1/2017, at 33.

The trial court found J.B. presented a "self-rationalizing appraisal of himself" and "attempt[ed] to downplay the episode in a calm, casual light." Trial Court Opinion, 4/17/2018, at 6. The trial court determined that the "third party assessment of the experienced officer … paint[ed] a different picture." *Id.* The trial court concluded

> that [J.B.] committed acts in furtherance of a threat to commit suicide, and that Corporal Needham personally observed [J.B.'s] need for immediate treatment based on his severely disabled mental state. *See Commonwealth v. Smerconish*, 112 A.3d 1260 (Pa. Super. 2015) (affirming trial court's conclusion that there was sufficient evidence for an involuntary commitment after Appellant sent his sister several instant messages in which he threatened to kill himself and made online searches seeking painless methods to die, but ultimately decided he was frightened of suicidal acts); *see also In re R.F.*, 914 A.2d 907 (Pa. Super. 2006) (affirming trial court's conclusion that evidence justified involuntary commitment considering Appellant's stress over divorce, internet search on how to commit suicide, and call to suicide hotline).

*Id.* at 6-7.

Based on our review, we agree, albeit reluctantly, with the trial court's determination that the evidence was sufficient for Corporal Needham to take J.B. for an involuntary emergency examination without a warrant. We recognize that J.B.'s distress was caused by the recent Skype/text conversation with his wife, and that he had returned the firearm to the locked safe before the arrival of the police.[4] However, considering Corporal Needham's appraisal of J.B., in the light of the dispatch for a "suicidal male,"

---

[4] It bears mention that although J.B. had locked the firearm in a safe in his house, he still had the ability to access the firearm.

J.B's distraught demeanor, and J.B.'s admission that he had a firearm in his hand and wanted to shoot himself and die, we are constrained to agree with the trial court that these facts constituted reasonable grounds for Corporal Needham to take J.B. for an emergency examination without a mental health warrant. While J.B. makes a forceful argument that Corporal Needham observed no threat and no act in furtherance of any suicide threat, the cases cited by the trial court undermine this argument. ***See Smerconish, supra,*** 112 A.3d at 1264 (online research seeking painless methods of committing suicide constituted an act in furtherance of the threat to commit harm); ***In re R.F., supra***, 914 A.2d at 914 (appellant's use of the internet to access ways to commit suicide, and phone call to a suicide hotline to gather further information on the subject coalesced to constitute proof in furtherance of appellant's suicidal ideation). Therefore, J.B.'s first argument is unsuccessful.

In his second issue, J.B. claims the trial court abused its discretion in determining there was cause for immediate involuntary treatment where Part I of the 302 Application indicates that J.B., prior to the arrival of police, placed his firearm in a locked safe. J.B. argues:

> Assuming, *arguendo*, that [J.B.] was properly found to be severally [sic] mentally disabled as defined by the MHPA, the physician's determination in the present matter is still based on insufficient evidence, because the record available at the time of [J.B.'s] admission is devoid of any evidence to suggest there was a need for immediate treatment.
>
> ****
>
> It is [J.B.'s] position that a need for immediate treatment was not and cannot be shown in the present matter, where [J.B.] (1) had

already resolved the situation evidencing the alleged disability, (2) was willing to accept any treatment despite not requiring it, and (3) did not receive any immediate treatment or any recommendation for same.

****

Moreover, [J.B.] is shown by the record to never have resisted any offer of possible treatment. [J.B.] was extremely cooperative, per the testimony of Corporal Needham. When given the opportunity to voluntarily accept treatment by signing a consent form, [J.B.] did so. [J.B.] could not have been in need of immediate, involuntary treatment where his alleged condition had been resolved and he accepted voluntary treatment despite his perceived lack of immediate need.

Given the complete lack of record evidence relating to the need for immediate treatment, the trial court abused its discretion in determining that Dr. Taylor had sufficient evidence to find the second threshold requirement for any form of involuntary treatment under the MHPA.

J.B.'s Brief at 22-25.

The PSP counters that "[J.B.] being cooperative is not what matters; what matters is that Dr. Taylor's examination determined J.B. was committable." PSP Brief at 11 (footnote omitted). PSP asserts J.B.'s argument "also fails because the decision of the physician is … entitled to deference as it is the committing physician who possesses the requisite training and knowledge to commit the individual." *Id.* at 11-12, *citing **In re Vencil, supra***, 152 A.3d 235, 246 (Pa. 2017). PSP maintains J.B.'s argument asks this Court to second-guess the physician's expert opinion of the existing evidence, in clear contravention of the requirements of ***Vencil***.

PPI takes the same position as the PSP. PPI asserts Dr. Taylor examined J.B. within two hours of his arrival at the hospital, and her findings were

recorded in the Application for Involuntary Emergency Examination and Treatment. PPI further states, "Dr. Taylor wrote that the treatment needed included, 'Review of meds. Medication/restraint as necessary.'" PPI Brief at 15-16. PPI maintains the essential requirements for an involuntary commitment under the MHPA were met.

DCCI adds Dr. Taylor's findings were also corroborated with Crisis Counselor James Cooper's intake. *See* DCCI Brief at 21. Finally, DCCI maintains that "the only evidence sought to contradict the physician's finding is [J.B.'s] alternative explanations, which the lower court found as lacking credibility." *Id.* at 24.

In *Vencil, supra*, the Pennsylvania Supreme Court held:

> [T]he plain language of section 6111.1(g)(2) requires a court of common pleas to review only the sufficiency of the evidence to support the 302 commitment, limited to the information available to the physician at the time he or she made the decision to commit the individual, viewed in the light most favorable to the physician as the original decision-maker to determine whether his or her findings are supported by a preponderance of the evidence.

*Id.* at 237. The *Vencil* Court explained:

> Section 6111.1(g)(2) does not … authorize a trial court to "redecide[] the case," operating as a "substitute[]" for the physician who originally decided the 302 commitment was medically necessary. …
>
> … A sufficiency review pursuant to section 6111.1(g)(2) of the Uniform Firearms Act is merely a mechanism to expunge the PSP's record of an individual's 302 commitment to remove this barrier to his or her possession and control of firearms.

\*\*\*\*

- 13 -

[U]nder section 6111.1(g)(2), a challenge to the sufficiency of the evidence to support a 302 commitment presents a pure question of law, and the court's sole concern is whether, based on the findings recorded by the physician and the information he or she relied upon in arriving at those findings, the precise, legislatively-defined prerequisites for a 302 commitment have been satisfied and are supported by a preponderance of the evidence. We emphasize that the trial court's review is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings, and requires deference to the physician, as the original factfinder, as the physician examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary.

*Id.* at 244-245, 246.

Here, the trial court, applying ***Vencil***, opined:

[T]he information relied upon by the physician, Dr. Allison Taylor, for a 302 commitment was aptly supported by a preponderance of the evidence. Corporal Needham's observations that [J.B.] was emotionally upset, crying, and at one point had a firearm in his hand and wanted to shoot himself warranted the corporal's signature for a 302 application for involuntary examination and treatment. In turn, it provided the basis for information relied upon by Dr. Taylor in conjunction with her examination of [J.B.]. Although we must review the commitment from the view of the committing physician and what she observed at the time, the crisis counselor's intake notes corroborate the observable state of mind of [J.B.] just after the interaction of the police officer and just prior to being seen by the physician. They bespeak of how [J.B.] was presenting and bolsters the observations, conclusions, and assessments of the corporal, wife, and physician alike. Notably, they run contrary to [J.B.'s] self-rationalizing appraisal of himself. …

Trial Court Opinion, 4/17/2018, at 5-6.

In reviewing the trial court's decision, we follow the Pennsylvania

Supreme Court's instruction that "the plain language of section 6111.1(g)(2)

- 14 -

directs a trial court to review the physician's findings, made at the time of the commitment, to determine whether the evidence known by the physician at the time, as contained in the contemporaneously-created record, supports the conclusion that the individual required commitment under one (or more) of the specific, statutorily-defined circumstances." ***Vencil, supra*** at 242. Here, the information available to Dr. Taylor at the time she made the decision to commit J.B., included not only her own findings upon examination of J.B., but also her professional assessment of Corporal Needham's statement concerning his interaction with J.B. As the trial court opined, the crisis counselor's notes corroborate J.B.'s observable state of mind. Applying the above-stated standard for a Section 6111.1(g)(2) review, we concur with the trial court's determination that Dr. Taylor had sufficient evidence for the Section 302 commitment of J.B. It follows that there was no abuse of discretion by the trial court in denying J.B.'s petition for expungement.

Accordingly, we affirm.

Order affirmed.

President Judge Emeritus Ford Elliott joins this memorandum.

Judge McLaughlin concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/21/2018

- 15 -