**In re R.F.**

**Appeal of R.F.**

Superior Court of Pennsylvania.

Filed Dec. 27, 2006.

---

Rebecca A. Craggs, Stroudsburg, for appellant.

Tara L. Patterson, Stroudsburg, for Pa. State Police, Participating Party.

Gerard J. Geiger, Harrisburg, for Carbon–Monroe–Pike MH–MR and Pocono Med. Center, Participating Parties.

BEFORE: JOYCE, STEVENS and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant R.F. appeals the order refusing to expunge his civil commitment record on the basis that the evidence was insufficient to support the same. We affirm.

■ ¶ 2 From the trial court's order denying Appellant's request to expunge evidence of his civil commitment, a timely appeal to this Court was filed claiming that: 1) the trial court erred in applying an improper standard of review; 2) the evidence was insufficient to justify the initial involuntary commitment under 50 P.S. § 7302(a)(2) (involuntary emergency examination and treatment—peace officer); and 3) the evidence was insufficient to justify the continued involuntary treatment under 50 P.S. § 7303 (application for extended involuntary emergency treatment).

¶ 3 Before reaching the merits of Appellant's claims, we note that a person who has been unlawfully committed to a state mental facility has a constitutional right to the destruction of hospital records created as a result of the illegal commitment. *Wolfe v. Beal*, 477 Pa. 477, 384 A.2d 1187 (1978). *Wolfe's* rationale has been extended to require that court records also be expunged when an illegal commitment occurs; to-wit:

To be sure, the question of expungement of court records arising from an illegal commitment was not at issue in *Wolfe* simply because the lower court's decision to order such relief was not challenged. However[,] we think it clear that the Court's reasoning regarding destruction of the hospital records is equally applicable to the issue *sub judice*. Be they hospital records or court records, the dispositive fact is that they originated as a result of an illegal proceeding subsequently declared null and void; and, in either case, their "continued existence [ ... ] pose a threat to

[A]ppellant's reputation." *Id.* Under such circumstances, and in the absence of any compelling reason to the contrary offered by the Commonwealth, justice demands that [A]ppellant be returned to a position as near as possible as that which [J.T.] enjoyed prior to the illegal commitment; namely, an unsullied record.

*Commonwealth v. J.T.*, 279 Pa.Super. 127, 420 A.2d 1064, 1065 (1980) (citations omitted). The destruction/expungement of civil commitment records (be they generated in a hospital or court context) are required if "they originated as a result of an illegal proceeding subsequently declared null and void[.]" *J.T.*, 420 A.2d at 1065. Herein, this translates into a determination of whether the trial court's holding that "the evidence presented [ . . . ] was sufficient to find [Appellant] in need of involuntary treatment under the Mental Health Procedures Act" was the product of an illegal proceeding unsupported by clear and convincing evidence. *See In Re Hancock,* 719 A.2d 1053 (Pa.Super.1998) (the degree of proof necessary to commit a person for mental evaluation under 50 P.S. § 7303 is clear and convincing evidence).

¶ 4 At bar, Appellant became the focus of inquiry when he phoned a suicide hotline ("New Hope Health Clinic") on the 17th of April, 2004, and asked if the service sold information on various ways to commit suicide. N.T. (Expungement Hearing), 10/28/05, at 9. In advance of calling the hotline, Appellant went to the "Google" web site and keyed in the search phrase "suicide, how to commit." *Id.* at 7. Appellant then clicked on the first link at the top of the "Google" page, which read: "How to Commit Suicide [—] Ways Methods." On the second page of the web site, Appellant downloaded the following, as herein relevant:

How to commit suicide methods of committing suicide and painless suicide methods—How to Commit Suicide Successfully, effective methods ways [to] commit suicide[;] best methods of suicide[;] painless ways to commit suicide[;] how to commit suicide[;] and suicide causes how to commit suicide [ . . . ].

**How To Commit Suicide**

First let me say that death will achieve ultimate freedom from pain, fear, and depression. It is also the only way to experience complete peace. The hell of the [ . . . ] pointless life and existence holds absolutely no meaning or reason to live. Nothing matters anymore because the deep pain is all that can be felt, and every day it [ . . . ] gets worse and worse. No one cares! They have proven it by how they hurt me. LOVE IS A LIE! The voice inside says freedom from the pain is to just end it, so [get] it over with. I know these things and I know how to commit suicide [ . . . ]. Let me explain [ . . . ].

\* \* \* \*

If you are going to kill yourself, today [ . . . ] are thinking about it, call Toll Free: 800–784–2433 (answered 24 hours) to find out more about death. [ . . . ].

Appellant's Exhibit No. 1, 10/28/05. Appellant phoned the 800 number on page 2 of the exhibit at 1:30 p.m. on the 17th day of April, 2004, and spoke to a person from "New Hope": Appellant asked what they did there. Appellant also asked, "Do you sell information on various ways to commit suicide, [ . . . ] painless ways, effective ways [ . . . ?]. *Id.* at 9. Appellant further admitted to the hotline operator that he had a loaded gun. *Id.* at 10. Within two to three minutes, Appellant terminated the call. Sometime after 3:00 p.m., Pennsylva-

nia State Trooper Howard J. Bloomfield was dispatched to Appellant's home, and his account of what led to the arrival of the police is as follows:

I received a call from the station desk personnel to respond to [Appellant's] location in East Bangor[, Pennsylvania,] regarding a gentleman who threatened to commit suicide. The information I received was the person had a loaded rifle, they planned on using it and don't send the police because they're not going to get—the person has a loaded rifle, don't send the police. They're not going to get inside the residence.

*Id.* at 53–54.

¶ 5 Once Trooper Bloomfield arrived at the scene, Appellant was not immediately visible. After the passage of a few minutes, the trooper observed Appellant looking out the garage window.[1] A few minutes later, Appellant opened the garage door and walked toward the trooper, who advised Appellant that the state police had been alerted that someone had placed a phone call threatening to commit suicide, being in possession of a loaded rifle, not to send the police, and the call was traced to Appellant's home. Despite repeated pleadings by the trooper that Appellant was not under arrest, not in any trouble, and the police were just seeking the truth, Appellant denied making any phone call. N.T. (Expungement Hearing), 10/28/05, at 56.

¶ 6 The circumstances surrounding the suicide hotline call ("the person had a loaded rifle, planned on committing suicide, wanted to get it done right, [and said], don't send the cops," and Appellant denied making any such call) convinced Trooper Bloomfield to transport Appellant to the

Pocono Medical Center for evaluation. N.T. (Expungement Hearing), 10/28/05, at 62. En route to the hospital, Appellant admitted that he was depressed and going through a divorce. *Id.* at 63. Further, Appellant's wife told the police that her husband had been home all afternoon and not fishing, as previously reported to Trooper Bloomfield by Appellant.

¶ 7 Once at the Pocono Medical Center, Trooper Bloomfield completed an "Application For Involuntary Emergency Examination And Treatment" pursuant to Section 7302 of the Mental Health Procedures Act, which states, as herein pertinent:

### Part I
### APPLICATION

I believe that *[Appellant]* is severely mentally disabled: (Check and complete all applicable for this patient.)

A person is severely mentally disabled when, as a result of mental illness, his/her capacity to exercise self-control, judgment and discretion in the conduct of his/her affairs and social relations or to care for his/her own personal needs is so lessened that he/she poses a clear and present danger of harm to others or to himself or herself.

\* \* \* \*

Clear and present danger to himself shall be shown by establishing that within the past 30 days;

\* \* \* \*

*X* (ii) the person has attempted suicide and that there is reasonable probability of suicide unless adequate treatment is afforded under this act. For the pur-

---

1. This is at odds with Appellant's testimony of driving up to his home from a day of fishing, and, after exiting his jeep, observing the state police pulling into the driveway—no one was waiting for Appellant when he drove up in his jeep. N.T. (Expungement Hearing), 10/28/05, at 12.

pose of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide;

\* \* \* \*

Describe in detail the specific behavior within the last 30 days which supports your belief (include location, date, time whenever possible, and state who observed the behavior):

*On 04/17/04 called crisis hotline asked them how to commit suicide because he wants to get it wright [sic ]. [Appellant] told them not to send anyone because they would not get inside. [Appellant] stated he has a loaded rifle and he is going to use it. [Appellant] told me he is going through a divorce. [Appellant] called Washington D.C. and spoke with Paula. [Appellant] made these statements to her PH 703–241–9501. PSP Belfast then received call and related information.*

\* \* \* \*

On the basis of the information I gave above, I believe that *[Appellant]* is in need of involuntary examination and treatment. I request that: (Check A or B—Notice that B can only be checked by a physician, a police officer, the County Administrator or his/her delegate).

\* \* \* \*

B. [X ] That this facility examine the patient to determine his/her need for treatment.

/s/Tpr *Edward J. Bloomfield 4/17/04*

Appellant's Exhibit No. 4, 10/28/05. The involuntary commitment papers filed by Trooper Bloomfield resulted in an examination by Doctor DeFranco, which was conducted on the same date as Appellant's admission. Thereafter, the doctor found that Appellant exhibited "suicidal ideation" necessitating treatment in the form of, "In patient psychiatric evaluation, treatment, and protection from self." Further, the doctor opined: "The patient is severely mentally disabled and in need of treatment. He should be admitted to a facility [ . . . ] for a period of treatment not to exceed 120 hours." *Id.* at 6–7.

¶ 8 On April 21, 2004, a Section 7303 hearing was conducted by a mental health review officer to determine whether Appellant's stay in the psychiatric unit should be extended beyond the initial involuntary commitment of 120 hours. Doctor Abdo Saba, a psychiatrist, examined Appellant after his admission, which session resulted in the patient admitting feeling depressed, having suicidal thoughts, and calling a phone number on the internet to secure "more details about ways [on] how to commit suicide." N.T. (Section 7303 Hearing), 4/21/04, at 3. These suicidal ideations appeared to be rooted in the fact that Appellant was "going through a lot of stress, mostly [because] he [wa]s going through [a] divorce, and he was given 60 days to leave the house." *Id.* at 3.

¶ 9 Appellant misinformed Dr. Saba about the number of guns in his possession—initially admitted to owning a .22 revolver, but the police found two loaded guns in his car and one loaded rifle in his home. Further, Dr. Saba described Appellant as being isolated, very distracted, and manifesting sad features in the psychiatric unit. The doctor also reported that the patient refused to take a prescribed antidepressant after just one medication. And, Dr. Saba described Appellant as looking depressed the night before the Section 7303 hearing. N.T. (Section 7303 Hearing), 4/21/05, at 7. Under these circumstances, and the fact that Appellant's wife

secured exclusive possession of the home, Dr. Saba was afraid "the patient would get more depressed and carry out his suicidal thought." *Id.* at 5.

¶ 10 The second witness to testify was Trooper Bloomfield, whose account of events is consistent with the facts recited *supra.* N.T. (Section 7303 Hearing), 4/21/04, at 8–12. Lastly, R.F. took the stand and explained that his interest in the different ways people commit suicide was "one of curiosity," which was triggered after reading a magazine article on Dr. Kevorkian. This prompted Appellant to surf the internet "on about how to commit suicide [ . . . because he] had [his] own views on the subject, so there [wa]s a phone number there, and [he] called and they answered. [ . . . ] They said, Have you thought of committing suicide? [Appellant] said, sure." *Id.* at 16. After the Section 7303 hearing, the mental health review officer found that Appellant was a "danger to himself or others" and directed that his period of involuntary commitment at the Pocono Medical Center be extended for a period of five days or less. On April 23, 2004, Appellant was released from institutional care.

¶ 11 On June 15, 2005, Appellant filed a petition to expunge his civil commitment record, which request was denied by order of the trial court on grounds that Appellant was collaterally estopped from challenging the sufficiency of the evidence of the Section 7303 hearing. The order was appealed, and this Court vacated the same and remanded to afford Appellant an opportunity to litigate the issue of whether he was "severely mentally disabled" at the time of his commitment due to his mental state. *In re R.F.,* No. 3137 EDA 2004, 883 A.2d 700 (filed July 22, 2005) (unpublished memorandum). On remand, a hearing was conducted by the Court of Common Pleas of Monroe County on October 28, 2005, which denied Appellant's request to expunge his civil commitment record because "the evidence presented [ . . . ] was sufficient to find [Appellant] in need of involuntary treatment under the Mental Health Procedures Act." Trial court opinion, 12/30/05, at 4. The present appeal ensued raising three issues, which when distilled challenge the sufficiency of the evidence sustaining Appellant's involuntary civil commitment under Section 7302 and Section 7303.

¶ 12 Section 7302 of Title 50 of the Pennsylvania Statutes provides the guidelines which must be followed when involuntary emergency examination and treatment has been authorized by a physician or any peace officer. In pertinent part, Section 7302 provides as follows:

Section 7302. Involuntary emergency examination and treatment authorized by a physician—not to exceed 120 hours.

(a) Application for examination.— *Emergency examination may be undertaken at a treatment facility* upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or *without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.*

\* \* \* \*

(2) *Emergency examination without a warrant.—Upon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, any* physician or *peace officer,* or anyone authorized by the county administrator, *may take such person to an approved facility for an emergency ex-*

*amination.   Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.*

(b) Examination and determination of need for emergency treatment.—A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment.   If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately.   If the physician does not so find, or if at any time it appears there is no longer a need for immediate treatment, the person shall be discharged and returned to such place as he may reasonably direct.   The physician shall make a record of the examination and his findings.   In no event shall a person be accepted for involuntary emergency treatment if a previous application was granted for such treatment and the new application is not based on behavior occurring after the earlier application.

50 P.S. § 7302(a)(2), (b) (emphasis added).

¶ 13 As discussed above, a person can be involuntarily committed when he is "severely mentally disabled."   50 P.S. § 7301(a).   Further, persons are classified as severely mentally disabled when their ability to exercise self-control or to care for themselves is so lessened that they pose "a clear and present danger of harm to others" or themselves.   50 P.S. § 7301(a).   The Mental Health Procedures Act goes on to outline the determination of clear and present danger.   Relevant to Appellant's case, the statute provides:

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days: [ … ]

\* \* \* \*

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act.  For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide;  [ … ].

50 P.S. § 7301(b)(2)(ii).

¶ 14 The regulations further provide that a suicide attempt occurs when a person clearly articulates or demonstrates an intention to commit suicide and has committed an overt action in furtherance of the intended action.   55 Pa.Code § 5100.84(g).

¶ 15 When Trooper Bloomfield completed the involuntary commitment papers, Appellant had phoned a suicide hotline to quench his "curiosity" on the methodology of committing suicide, which phone number was secured from a web site accessed using the key words: "suicide, how to commit."   Appellant also conceded to the hotline operator that he had contemplated suicide, was in possession of a loaded weapon, wanted to do it "right," and not to send the police because they would be denied entry into his home.   Couple these events with the fact that Appellant admitted being depressed because of his impending divorce and removal from the house within 60 days, and the fact that he denied to police that he owned loaded weapons later found at his home and in his truck.

¶ 16 For involuntary commitment, it is not sufficient to find only that the person is in need of mental health services. It must also be established that there is a reasonable probability of death, serious injury or serious physical debilitation to or-

der commitment. *In re T.T.*, 875 A.2d 1123 (Pa.Super.2005). In this regard, Appellant asserts that his "contemplation" of personal injury without having taken a step in furtherance thereof should be viewed in his favor. In other words, Appellant argues that the lack of affirmative action on his part to attempt suicide undermines the trial court's finding of his need for involuntary treatment. We disagree.

¶ 17 We find that the trooper was in possession of sufficient facts (articulated in the involuntary commitment papers at Pocono Medical Center) constituting "reasonable grounds" to believe that Appellant was severely mentally disabled and in need of immediate treatment because he presented a "clear and present danger" to himself. To explicate, Appellant used the internet to access ways to commit suicide, and he phoned a suicide hotline to gather further information on the subject, which we find coalesce to constitute proof in furtherance of Appellant's suicidal ideation. *See* 50 P.S. § 7301(b)(1), (2); *see also Mertz v. Temple University Hospital*, 25 Pa. D. & C. 4th 541 (C.P.Philadelphia, 1995) (wife attempted to commit husband involuntarily to mental hospital because he threatened to commit suicide and had written several suicide notes to different family members; no authority in Pennsylvania holds that writing suicide notes cannot be considered an overt act in furtherance of the suicide; physician testified that writing several suicide notes indicates "a great sense of deliberation and seriousness of purpose about suicide," and "[f]or somebody to sit down and write four notes or five notes suggest[ed] to [doctor] as a clinician that there [wa]s a serious, deliberate intent to commit suicide. This [wa]s not a casual or impulsive thing." (citations omitted)).

¶ 18 Next, we turn to Appellant's complaint that the evidence was insufficient to continue his stay at the Pocono Medical Center under 50 P.S. § 7303.

¶ 19 Under Section 7303, when a facility deems a patient to be in need of additional care beyond the 120 hours of emergency care authorized by Section 7302, an application to extend treatment may be filed in the trial court and an informal hearing held within 24 hours of the filing of the application. 50 P.S. § 7303(a)-(b). After the hearing, if the judge or mental health review officer certifies the patient as severely mentally disabled, he may authorize up to an additional twenty days of treatment. 50 P.S. § 7303(c), (f). When this certification is made by a mental health review officer as opposed to a judge, the patient may petition the trial court to review the certification. 50 P.S. § 7303(g). A hearing is to be held within 72 hours of the filing of that petition. *Id.*

¶ 20 *Sub judice*, we find that Appellant's suicidal ideations were noted by Dr. DeFranco in the Section 7302 documents, as well as by Dr. Saba in the Section 7303 documents and during his testimony at the Section 7303 hearing. *See* Appellant's Exhibit 4, 10/28/05, at 7 (Dr. DeFranco's Results of Examination—Findings: "Suicidal ideation;" Treatment: "In patient psychiatric evaluation, treatment, and protection from self[ .]" "The patient is severely mentally disabled and in need of treatment." (dated 4/17/04)); Respondent's Exhibit 2, 10/28/05, at 2–3 (Dr. Saba: "Patient came in· on 302 petitioned by the police that patient had suicidal ideas and he had multiple loaded weapon[s] at home[.] Patient has been isolated on the unit refusing his medication, sad expression[,] pacing, hesitant[,] not being truthful about the place and number [ ... ] guns he has at home. Patient verbalized to me that he went on line looking for details 'How to commit

suicide' and further called phone # in Washington DC to get more details. The patient continues to be severely mentally disabled and in need of treatment." (dated 4/20/04); N.T. (Section 7303 Hearing), 4/21/04, at 3–4, 5 (Dr. Saba: "[Appellant] admitted to feeling depressed, admitted having suicidal thoughts. [Appellant] did admit that he was on-line. He wanted to know more about suicide and the ways to do it and he called a phone number that was on the Internet [ . . . for] more details about ways how to commit suicide. [ . . . ] [Appellant] said he was going through a lot of stress, mostly he's going through divorce, and he was given 60 days to leave the house. [Appellant] had suicidal thought[s] [ . . . ] I'm afraid that under these circumstances that [Appellant] [ . . . ] would get more depressed and carry out his suicidal thought[s]. [ . . . ] I have great concern that [Appellant is in] danger to hurt himself or hurt somebody else, and I'm asking the [mental health review officer] for 30 days or more for observation, for stabilization, before [Appellant] leave[s] the hospital.").

¶ 21 The clear and central intent of the General Assembly in enacting the Mental Health Procedures Act was to assure that those individuals who are severely mentally disabled will be provided with the medical care they need, for their own health and safety, and for the safety of others. Pennsylvania Courts have recognized that the state has a solemn duty to safeguard the welfare of the individual, and, additionally, the state is obligated to protect the welfare of others from the mentally ill. *In re Hutchinson*, 500 Pa. 152, 157, 454 A.2d 1008, 1011 (1982) (citations omitted).

¶ 22 With the expressed intent of the legislature in enacting the Mental Health Procedures Act, we are convinced that under such grave circumstances, our General Assembly envisioned that continued inpatient treatment would be available to those like Appellant in the interests of his welfare as well as community safety. *Appeal of Philadelphia County Office of Mental Health and Mental Retardation*, 526 Pa. 418, 425, 586 A.2d 909, 913 (1991).

¶ 23 The involuntary commitment of Appellant, viewed under the applicable statute and case law, was both necessary and proper. Given the serious inquiries entertained by Appellant on the 17th of April, 2004, medical professionals at Pocono Medical Center followed the letter and spirit of the Mental Health Procedures Act in taking action to continue his medical treatment. On that date, Appellant had expressed thoughts of suicide and taken steps on the internet to acquire the protocol to complete same. Once in the psychiatric unit, his attending physician (Dr. Saba) expressed concern that Appellant's continued depression, suicide ideation, and refusal to take his antidepressants would result in the patient getting "more depressed and carry out his suicidal thought." N.T. (Section 7303 Hearing), 4/21/04, at 5.

¶ 24 We are not insensitive to the stigma assigned by society to civil commitment. However, we hold that the record before us establishes clear and convincing evidence to justify Appellant's need of involuntary commitment (under both Section 7302 and Section 7303) consistent with the Mental Health Procedures Act. We do so predicated upon the following; to-wit: 1) Appellant's stress over divorce proceedings initiated by his wife, as well as her securing exclusive possession of the marital home; 2) Appellant's searching the internet for data on "How to commit suicide," and following this by calling a suicide hotline for information on the topic provided on the web site; 3) Appellant's denial when inquiry was made by police and medical personnel regarding possession of loaded weapons in his home

and truck; 4) Appellant's admission to the hotline operator and medical personnel that he had contemplated suicide; 5) Appellant's suicide ideation is confirmed by hospital records; and 6) finally, the trial court attributing Appellant with a lack of credibility at the October 28, 2005, hearing, which was conducted on remand from this Court's vacation of the order dismissing Appellant's petition, filed pursuant to 18 Pa.C.S. § 6111.1(g)(2) of Pennsylvania's Firearms Act, to expunge all records of his involuntary commitment under Section 7302 and Section 7303 of the Mental Health Procedures Act. *In re R.F.*, No. 3137 EDA 2004, 883 A.2d 700 (filed July 22, 2005) (unpublished memorandum) (case remanded to allow Appellant "full and fair" opportunity to litigate the issue of whether he was "severely mentally disabled" at the time of his Section 7303 commitment hearing). Such a "full and fair" hearing did occur here.[2]

¶ 25 Accordingly, in light of the preceding, we find no merit to any of Appellant's claims seeking to expunge evidence of his involuntary commitment under Section 7302 and Section 7303 of the Mental Health Procedures Act.

¶ 26 Order affirmed.

---

**2.** Section 7303(g) of the Mental Health Procedures Act, prescribing a "review of the certification" resulting in involuntary commitment, does not require a full, *de novo* hearing. However, it does require some hearing. *In re T.J.*, 559 Pa. 118, 739 A.2d 478 (1999). In particular, the Act provides, "The hearing shall include a review of the certification and such evidence as the court may receive or require." 50 P.S. § 7303(g). Herein, the trial court received testimonial evidence from Appellant, Trooper Bloomfield and his partner (Trooper Kelly), as well as documentary evidence consisting of Appellant's internet search, application for involuntary examination, application

for extended involuntary treatment, medical records, and the transcript of the hearing held on April 21, 2004 (mental health review officer took testimony of Dr. Saba, Appellant, and Trooper Bloomfield). Such testimonial and documentary evidence satisfy the need for a "full and fair" hearing directed by this Court on remand, which presents clear and convincing evidence sufficient to sustain the propriety of the Section 7303 hearing, which undermines Appellant's request to expunge evidence of his Section 7303 involuntary commitment. *Contrast In re Estate of S.G.L.*, 885 A.2d 73 (Pa.Super.2005).