IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| IN RE: B.W. | : No. 14 WAP 2020 |
| | : |
| | : |
| | : Appeal from the Order of the |
| APPEAL OF: BLAIR COUNTY | : Superior Court entered November 1, |
| DEPARTMENT OF HUMAN SERVICES | : 2019 at No. 289 WDA 2019, |
| | : reversing the Order of the Court of |
| | : Common Pleas of Blair County |
| | : entered February 13, 2019 at No. |
| | : 2018 GN 2882, and remanding. |
| | : |
| | : ARGUED: October 22, 2020 |

## OPINION

**JUSTICE MUNDY**                                    **DECIDED: MAY 18, 2021**

In this appeal by allowance, we consider whether the Superior Court erred in ordering the expungement and destruction of the medical records of the Section 302 involuntary emergency examination and treatment of Appellee, B.W., on the basis that the Section 302 petition was insufficient to prove B.W. was a clear and present danger to others. We conclude the Superior Court erred as the physicians' records contained sufficient facts to prove B.W. made a threat to harm another person and acted in furtherance of that threat by developing a plan to harm that person, which the physicians found credible. Accordingly, we reverse the Superior Court's order.

## I. PENNSYLVANIA'S MENTAL HEALTH PROCEDURES ACT AND EXPUNGEMENT OF INVOLUNTARY COMMITMENT RECORDS

The legislature enacted Pennsylvania's Mental Health Procedures Act (MHPA), 50 P.S. §§ 7101-7503, to establish procedures "to assure the availability of adequate

treatment to persons who are mentally ill." 50 P.S. § 7102. The MHPA's provisions "shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others." *Id.* One treatment option the MHPA governs is involuntary emergency examination and treatment, commonly referred to as a "302 commitment." *See* 50 P.S. § 7302. Section 302 of the MHPA provides that an involuntary emergency examination of a person may occur upon a physician's certification. 50 P.S. § 7302(b). If the examining physician determines "that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately" and may continue for up to 120 hours. 50 P.S. § 7302(b), (d); *see also* 50 P.S. § 7301(a) (providing a person who is "severely mentally disabled and in need of treatment" may be subject to "involuntary emergency examination and treatment").

Section 301 further provides that a person is "severely mentally disabled" when mental illness causes the person's "capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself[.]" 50 P.S. § 7301(a). Section 301(b)(1) lists the following criteria for showing a person is a clear and present danger of harm to others:

> (b) **Determination of Clear and Present Danger.**--(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. If, however, the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, such 30-day limitation shall not apply so long as an application for examination and treatment is filed within 30 days after the date of such determination or verdict. In such case, a clear and present danger to others may be

shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated. For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

50 P.S. § 7301(b)(1).[1]

---

[1] Section 301(b)(2) contains the criteria for determining that a person is a danger to himself or herself:

> (2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:
>
>> (i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or
>>
>> (ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or
>>
>> (iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

The Pennsylvania Uniform Firearms Act of 1995 (UFA), 18 Pa.C.S. §§ 6101-6128, makes it unlawful for a person who has been involuntarily committed under Section 302 to "possess, use, control, sell, transfer or manufacture" a firearm or to obtain a license to conduct any of those activities. 18 Pa.C.S. § 6105(a)(1), (c)(4). However, the UFA provides two ways for the subject of a 302 commitment to obtain relief from the Section 6105(a)(1) firearm restrictions. The one at issue in this case is a court-ordered expungement of the 302 commitment record under Section 6111.1(g)(2), which provides:

(g) **Review by court.**—

. . .

> (2) A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged. A petition filed under this subsection shall toll the 60-day period set forth under section 6105(a)(2).

. . .

18 Pa.C.S. § 6111.1(g)(2).[2]

This Court clarified the appropriate review of a Section 6111.1(g)(2) petition to expunge a 302 commitment record based on the sufficiency of the evidence to support the 302 commitment in *In re Vencil*, 152 A.3d 235 (Pa. 2017):

---

50 P.S. § 7301(b)(2).

[2] The second means for the subject of a 302 commitment to obtain relief from the Section 6105(a)(1) firearms restrictions is to petition the trial court to grant relief based on a finding that "the applicant may possess a firearm without risk to the applicant or any other person." 18 Pa.C.S. § 6105(f)(1).

under section 6111.1(g)(2), a challenge to the sufficiency of the evidence to support a 302 commitment presents a pure question of law, and the court's sole concern is whether, based on the findings recorded by the physician and the information he or she relied upon in arriving at those findings, the precise, legislatively-defined prerequisites for a 302 commitment have been satisfied and are supported by a preponderance of the evidence. We emphasize that the trial court's review is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings, and requires deference to the physician, as the original factfinder, as the physician examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary.

*Vencil*, 152 A.3d at 246 (rejecting de novo review subject to clear and convincing burden of proof for Section 6111.1(g)(2) petitions).

## II. FACTUAL AND PROCEDURAL HISTORY

With this legal framework in mind, we set forth the facts of this case. On September 6, 2018, B.W. went to Altoona Family Physicians, his primary care provider's office. The office visit notes show that on September 6, 2018, Dr. Joseph Sumereau was the provider who treated B.W., while Dr. Amanda Cattol was B.W.'s primary care physician. Office Visit Notes, 9/6/18. The physician's progress notes of the office visit, signed by Dr. Terry Ruhl, indicate the reason for B.W.'s visit was "anxiety" and the primary diagnosis was "agitation." *Id.* Dr. Ruhl elaborated:

> Discussed with Dr. Sumereau and Jimmy.
> Anxiety and anger feelings. Making credible threats of violence against a co-worker but is here for help. Girlfriend has concerns for his safety.
>
> Crisis here now - expect they will recommend inpatient treatment, involuntary if necessary. UPMC police here for safety, but he has made no threats against staff.

*Id.* (note entered 9/10/18 regarding 9/6/18 visit).

Indeed, on September 6, 2018, Dr. Sumereau submitted a Section 302 application for involuntary emergency examination and treatment for B.W. Appl. for Involuntary Emergency Examination & Treatment, 9/6/18, at 1. Dr. Sumereau completed Part I of the application as "the person who believes the patient is in need of treatment." *Id.* Dr. Sumereau selected the pre-printed option on the form indicating he believed B.W. was "severely mentally disabled" because he posed a clear and present danger to others. *Id.* at 2 (marking the box on the form largely reciting the Section 301(b)(1) criteria). Dr. Sumereau completed the narrative portion of the 302 application with a description of the details that supported his belief, as follows:

> I, Dr. Sumereau, was present while the patient stated that he would strangle another person to death. He then gave the name of the intended victim.
>
> Patient stated that he was not sure when or where he would perform this act, but he would do it the next time he saw the person.

*Id.* at 3. As a result, Dr. Sumereau certified that B.W. was in need of involuntary examination and treatment, and he requested that UPMC Altoona Hospital examine B.W. to determine his need for treatment. *Id.*

B.W. was transported to UPMC Altoona, where the examining physician, Dr. Mercedes Boggs, noted the findings of her examination of [B.W.] were that "[B.W.] is homicidal toward his coworker and admits to stating that he would strangle him. [B.W.] very angry and agitated, danger to others. Not receptive to voluntary admission." *Id.* at 7. She noted the treatment needed was "[f]urther evaluation and assessment, therapy and medication." *Id.* She certified B.W. was "severely mentally disabled and in need of treatment" and recommended his admission to a facility for up to 120 hours of treatment. *Id.* Accordingly, B.W. was involuntarily committed at the Altoona Hospital Mental Health Unit, and he was released after 72 hours. Pet. to Expunge, 10/2/18, at ¶¶ 2, 10.

On October 2, 2018, B.W. filed a petition to expunge mental health record. In the petition, B.W. averred "there was no basis to the involuntary commitment as he was not homicidal and did not express any homicidal ideations." *Id.* at ¶ 11. He claimed he had no intent to carry out his threat and characterized his statements to Dr. Sumereau as "blowing off steam." *Id.* at ¶ 8. He asserted the record of his involuntary commitment impaired his employment opportunities and his ability to carry a firearm. *Id.* at ¶ 13. Accordingly, he requested relief in the form of a trial court order directing the Altoona Hospital and the Pennsylvania State Police (PSP) to expunge the records of his September 6, 2018 involuntary commitment. *Id.* at ¶ A. Even though the petition did not expressly cite Section 6111.1(g)(2), it is clear from the request for relief that B.W. requested a Section 6111.1(g)(2) review of his 302 commitment.

On January 4, 2019, the trial court held a hearing on the petition to expunge. At the hearing, the PSP introduced the 302 commitment record into evidence, and B.W. introduced the Altoona Family Physicians' office visit notes. N.T., 1/4/19, at 2, 23. Additionally, the trial court heard the testimony of B.W. and his girlfriend despite the objection of the Blair County Department of Social Services (DSS) that the testimony was not relevant to the sufficiency of the evidence according to *Vencil. Id.* at 2-3.[3] Neither DSS nor the PSP presented any testimony. *Id.* at 26. At the conclusion of the hearing, the trial court took the matter under advisement pending the transcript of the hearing and the parties' memoranda of law. *Id.*

On February 13, 2019, the trial court issued an order denying B.W.'s petition to expunge. Trial Ct. Order, 2/13/19. In its accompanying opinion, the court identified the issue as whether B.W. committed an act in furtherance of his threat to strangle his

---

[3] As this testimony is irrelevant to a Section 6111.1(g)(2) review under *Vencil*, we do not consider it. *See Vencil*, 152 A.3d at 238-39 n.3, 244.

coworker. Trial Ct. Op., 2/13/19, at 16. The court found it was undisputed that B.W. made threats to harm his coworker. *Id.* at 15. The trial court stated the "act in furtherance" inquiry was a fact-specific determination made on a case-by-case basis. *Id.* at 6. Addressing whether B.W. acted in furtherance of his threat, the court initially noted that B.W. did not communicate by any means his threat to his coworker or a third party; he did not engage in a physical altercation with his coworker; and he did not search the internet for ways to strangle or injure another person. *Id.* at 15. Nonetheless, the trial court concluded that Dr. Sumereau's description of B.W.'s statement that he would strangle his coworker "the next time he saw this person" was sufficient to support the conclusion that B.W. was a clear and present danger to others. *Id.* It explained that under *Vencil*, "[w]e must give deference to the physician, as the original factfinder, as the physician examined and evaluated [B.W.], and was able to observe his demeanor." *Id.* Applying *Vencil*, the court found "that the evidence known by the physician at the time, as contained in the contemporaneously-created record, supports the conclusion that [B.W.] presented a clear and present danger to others, requiring a 302 commitment." *Id.* Accordingly, the trial court denied B.W.'s petition to expunge. B.W. appealed to the Superior Court.

In a 2-1 unpublished non-precedential memorandum decision, the Superior Court reversed the trial court order denying B.W.'s petition to expunge. *In re B.W.*, No. 289 WDA 2019, 2019 WL 5682614, at *6 (Pa. Super. Nov. 1, 2019). The Superior Court concluded that the involuntary commitment petition did not contain sufficient facts to prove B.W. took an "act in furtherance" of his threat to kill his coworker. *Id.* at *5. The court viewed B.W.'s statement that he intended to strangle his coworker the next time he saw him as a bare threat without an accompanying act in furtherance. *Id.* at *6.

In support of its decision, the Superior Court analogized this case to its unpublished decision in *Interest of K.M.*, No. 1677 MDA 2018, 2019 WL 3243142 (Pa. Super. July 17, 2019).[4] *Id.* at *5-6. In *K.M.*, the involuntary commitment petition stated that K.M. told medical staff that he would not live long enough for his medical bill to matter, that he would end his life when his medical debt was too much, and that "he could take a 350 mag [sic] to his head and pull the trigger & kill people with no care." *K.M.*, 2019 WL 3243142, at *1. The *K.M.* Court held these statements were insufficient to support the involuntary commitment because "besides examples of threatening thoughts and statements, the record contains no evidence of any act undertaken by [K.M.] in furtherance of his threat to harm himself or others." *Id.* at *5. Therefore, the court concluded the records of K.M.'s involuntary commitment had to be expunged and destroyed. *Id.*

In this case, the Superior Court rejected DHS and PSP's argument that *K.M.* was distinguishable because B.W. identified his intended victim and stated how he would carry out the threat. *In re B.W.*, 2019 WL 5682614, at *6. The court explained that "the threat itself, without more, does not constitute an act in furtherance of the threat." *Id.* Accordingly, the Superior Court reversed the trial court and ordered that the records of B.W.'s involuntary commitment must be expunged and destroyed. *Id.*

Judge Lazarus filed a dissenting memorandum in which she opined that proof of an act in furtherance of the threat to commit harm was not necessary for a Section 302 involuntary commitment, and even if it was necessary, applying the *Vencil* standard to the physicians' statements showed the evidence was sufficient to support B.W.'s involuntary commitment. *Id.* (Lazarus, J., dissenting). Judge Lazarus explained that Section

---

[4] The Superior Court noted that its unpublished, non-precedential decisions filed after May 1, 2019 may be relied on for their persuasive value. *In re B.W.*, 2019 WL 5682614, at *6 n.2 (citing Pa.R.A.P. 126(b)).

301(b)(1) does not necessarily require proof of an act in furtherance because it states that a threat and an act in furtherance may, not must, demonstrate a clear and present danger of harm to others. *Id.* at *9 (relying on *Commonwealth v. Helms*, 506 A.2d 1384, 1388 (Pa. Super. 1986)). Further, Judge Lazarus found the evidence was sufficient to prove B.W. committed an act in furtherance of his threat to his coworker because in his statements "he identified a co-worker as his target and had chosen strangulation as the means by which he intended to kill that target[, and] physicians found B.W.'s threats credible." *Id.* at *10. Applying *Vencil*, Judge Lazarus concluded that the evidence known by the physicians at the time of the involuntary commitment was sufficient to support their conclusions that an involuntary commitment was medically necessary. *Id.*

## III. ISSUE AND STANDARD OF REVIEW

This Court granted DSS's petition for allowance of appeal to consider the following issue:

> Whether the development of a plan satisfies the requirement for an act in furtherance of a threat to kill a co-worker for purposes of an involuntary commitment under § 302 of the Mental Health Procedures Act?

*In re B.W.*, 235 A.3d 272 (Pa. 2020) (per curiam).[5]

Generally, this issue presents a question of law, over which our standard of review is de novo and our scope of review is plenary. *Vencil*, 152 A.3d at 241. Additionally, given that we are reviewing a Section 6111.1(g)(2) expungement ruling, we are limited to considering the evidence the physician knew at the time of the 302 commitment. *Id.* at 242. Further, as this issue presents a question of statutory interpretation, we note that in construing a statute, we must give effect to the legislature's intent and give effect to all of the statute's provisions. 1 Pa.C.S. § 1921(a). The plain language of the statute is the

---

[5] PSP filed a notice of joinder to DSS's petition for allowance of appeal, and following the grant of the petition, our prothonotary deemed both DSS and PSP as the appellants.

best indication of the legislature's intent. *Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 674 (Pa. 2020). To discern the plain meaning of a statute, we consider the operative statutory language in context and give words and phrases their common and approved usage. *Id.* Courts must give effect to a clear and unambiguous statute and cannot disregard the statute's plain meaning to implement its objectives. *Id.* "Only if the statute is ambiguous, and not explicit, do we resort to other means of discerning legislative intent." *Matter of Private Sale of Prop. by Millcreek Twp. Sch. Dist.*, 185 A.3d 282, 291 (Pa. 2018).

## IV. ACTS IN FURTHERANCE OF THE THREAT TO COMMIT HARM TO OTHERS
## A. PARTIES' ARGUMENTS

The PSP argues that the plain language of Section 301(b)(1) does not require the showing of an "act in furtherance" for all involuntary commitments based on a clear and present danger to others. PSP's Brief at 13. Echoing Judge Lazarus's dissent, the PSP stresses that the operative sentence of Section 301(b)(1) states that "a clear and present danger of harm to others **may** be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm." *Id.* (quoting 50 P.S. § 7301(b)(1) (emphasis added)).[6] The Superior Court erred in holding that acts in furtherance are required in all cases, according to the PSP, because such an interpretation renders the legislature's use of the word "may" mere surplusage. *Id.* at 14 (citing 1 Pa.C.S. § 1921(b); *Helms*, 506 A.2d at 1388 (observing the "threats and acts" formula may, not must, be used to demonstrate a clear and present danger)). Instead, the PSP contends that B.W.'s plan to strangle his coworker established a "clear and present danger" to another person, as three examining physicians found. *Id.* at 15.

---

[6] DSS does not pursue this argument in its brief.

Moreover, DSS and the PSP contend we should reverse the Superior Court's decision because B.W.'s development and completion of a detailed plan to strangle his coworker to death the next time he saw him constitutes an "act in furtherance" under Section 301. DSS's Brief at 6; PSP's Brief at 5. DSS points to court cases construing the "act in furtherance" requirement of the Section 301 criteria for showing a person is a clear and present danger to others, 50 P.S. § 301(b)(1), or a clear and present danger to himself or herself, 50 P.S. § 301(b)(2)(i)-(ii), as consisting of both tangible and intangible actions. DSS's Brief at 8-9. DSS argues that the Superior Court's holding that B.W.'s complete plan to harm another did not constitute an act in furtherance is inconsistent with this precedent and the plain language of Section 301, which DSS interprets as requiring only that "the subject of an involuntary commitment will have done something to advance the threat of harm to himself or others." *Id.* at 10. The PSP contends that B.W.'s "specific and detailed plan itself was a sufficient act in furtherance to justify the commitment, particularly when the [Superior Court] was required to give deference to the committing physician pursuant to this Court's decision in [*Vencil*]." PSP's Brief at 7. Emphasizing the deference courts must give to the examining physicians under *Vencil*, the PSP stresses that the three physicians in this case deemed B.W.'s homicidal threats credible and warranting involuntary examination and treatment. *Id.* at 11.

DSS maintains the plain language of Section 301 does not require the act in furtherance to be overt or tangible for two reasons. DSS's Brief at 11-13. First, DSS notes that unlike the Pennsylvania Crimes Code's requirement for proof of an "overt act in pursuance" of a conspiracy, 18 Pa.C.S. § 903(e), Section 301(b)(1) requires "acts in furtherance of the threat." *Id.* at 12. The lack of an adjective modifying "acts in furtherance" in Section 301, according to DSS, suggests the legislature knowingly avoided the requirement of an overt act. *Id.* (citing *Bowers v. Pa. Labor Relations Bd.*,

167 A.2d 480, 487 (Pa. 1961) (stating similar language in different statutes requires the same construction)).

Second, DSS posits that requiring an overt act would conflict with the stated intent of the MHPA to protect the safety of the patient and others. *Id.* at 12-13. DSS compares this case to *In re Woodside*, 699 A.2d 1293 (Pa. Super. 1997), in which the court concluded that a person committed an act in furtherance of a threat when he purchased a rifle scope after stating he "might as well get a rifle and scope and get rid of my problem. The problem being my soon to be ex-wife." *Woodside*, 699 A.2d at 1294. DSS contends the only difference between this case and *Woodside* is that the plan in *Woodside* involved a weapon while the plan in this case involved the use of B.W.'s hands, which DSS maintains is "a distinction without a difference that would produce an absurd result if allowed." DSS's Brief at 13. Further, DSS analogizes this case to *In re R.F.*, 914 A.2d 907 (Pa. Super. 2006), which found that the patient's internet research of painless ways to commit suicide was an act in furtherance of the threat to harm himself. *R.F.*, 914 A.2d at 915. DSS emphasizes that "B.W. made a threat and had a plan that only needed the appearance of the intended victim for completion." DSS's Brief at 14; *see also* PSP's Brief at 9 (analogizing this case to *R.F.* and arguing the totality of the circumstances coupled with deference to the physicians' findings "coalesce into sufficient evidence").

Similarly, the PSP argues the interpretation that a specific plan constitutes an act in furtherance is necessary to avoid the absurd result that a physician cannot involuntarily commit a person who has articulated a clear and detailed plan until the person takes a step to carry out the plan. PSP's Brief at 12 (citing 1 Pa.C.S. § 1922(1) (stating "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable.")). The PSP states this result is inconsistent with the legislative intent of the MHPA, which is to help those in crisis and protect the public. *Id.* at 13. The PSP also

notes that its interpretation of Section 301 does not render mere threats sufficient to support an involuntary commitment, but it "gives a physician, who in their expert medical opinion believes that a threat that is accompanied with specific details and planning is credible, the ability to meaningfully act." *Id.* at 12-13 n.3. Accordingly, DSS and the PSP maintain we should reverse the Superior Court's decision. DSS's Brief at 14; PSP's Brief at 16.

In contrast, B.W. argues we should affirm the Superior Court. B.W. agrees with DSS and the PSP that the "development of a plan could satisfy the act in furtherance of a threat to kill a co-worker for purposes of an involuntary commitment under §302 of the [MHPA]," but B.W. argues the evidence did not show that B.W. had developed a plan to harm his coworker. B.W.'s Brief at 5. To support his position that he did not have a plan, B.W. relies exclusively on facts developed at the January 4, 2019 trial court hearing and characterizes his statements to the physicians as "blowing off steam" and "just words." *Id.* at 6. Like the Superior Court majority, B.W. relies principally on *K.M.* in support of his position that "[m]aking a threat to the doctor concerning another and indicating that he would carry out said threat next time he saw the co-worker is not a specific plan, nor an explicit plan of how he would harm the co-worker." *Id.* at 8. Ultimately, B.W. "agrees if there were an exact plan, then that could be considered an act in furtherance[,]" but there was no such plan in this case. *Id.* at 10. Accordingly, B.W. maintains we should affirm the Superior Court's decision that the record of his involuntary commitment should be expunged. *Id.* at 10-11.

## B. ANALYSIS

We first address the threshold issue the PSP raises of whether Section 301(b)(1) requires proof of an act in furtherance. Based on the plain language of Section 301(b)(1), we conclude that when an involuntary commitment is based on the "threat and act"

formulation, both a threat and an act in furtherance must be proven. Section 301(a) provides that a person may be involuntarily examined and committed if the person is severely mentally disabled, meaning the person is "a clear and present danger of harm to others or to himself." 50 P.S. § 7301(a). Section 301(b)(1) lists the criteria for determining a person is a clear and present danger to others as follows:

> (b) **Determination of Clear and Present Danger.**--(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. If, however, the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, such 30-day limitation shall not apply so long as an application for examination and treatment is filed within 30 days after the date of such determination or verdict. In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated. For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

50 P.S. § 7301(b)(1). From a plain reading of Section 301(b)(1), there are three alternative formulations of a clear and present danger to others: (1) the person has inflicted, or attempted to inflict, serious bodily harm on another in the past 30 days and there is a reasonable probability the person will repeat that conduct; (2) the person has been found incompetent to stand trial or acquitted due to lack of criminal responsibility of charges of inflicting, or attempting to inflict, serious bodily harm on another, and the petition establishes the charged conduct occurred and a probability it will be repeated; or (3) "the person has made threats of harm and has committed acts in furtherance of the threat to commit harm." *Id.*

Relying on *Helms*, the PSP, like Judge Lazarus's dissenting memorandum, contend that an act in furtherance is not required because the last sentence of Section 301(b)(1) uses the word "may" instead of "shall" or "must." PSP's Brief at 14 (quoting *In re B.W.*, 2019 WL 5682614, at *9 (Lazarus, J., dissenting)). This reliance on *Helms*, however, is misplaced because *Helms* recognized Section 301(b)(1) sets forth alternative ways to show a person is a clear and present danger to others. In *Helms*, Helms killed his next-door neighbor, but was acquitted at his criminal trial based on the finding of a lack of criminal responsibility under MHPA Section 404, 50 P.S. § 7404. *Helms*, 506 A.2d at 1386. However, the trial court also found Helms was severely mentally disabled and committed him involuntarily to a state hospital under MHPA Sections 304(g)(2) and 305. *Id.* Helms was involuntarily recommitted four times, and he challenged the sufficiency of his fourth recommitment on the grounds that the petition did not show he was a "clear and present danger" to others. *Id.* at 1386-87. The Superior Court concluded that the Section 301(b)(1) formulation of "clear and present danger" to others contained alternative methods to make such a showing. *Id.* at 1388. Specifically, the court explained that the last sentence of Section 301(b)(1), containing the "'threats and acts' formula *may*, not must, be used to demonstrate dangerousness." *Id.* (emphasis in original). The court based its statement that "threats and acts" are not always required on the preceding portion of Section 301(b)(1), which "contains an alternative method for showing clear and present danger which applies specifically to insanity acquittees who are the subjects of petitions for involuntary commitment[,]" namely that "(1) the conduct that led to the criminal proceedings occurred; and (2) that there is a reasonable probability that it will occur again." *Id.* Significantly, the court did not offer a further interpretation of the "threats and acts" requirement or opine that acts in furtherance were not required under that requirement. Instead, the court held that the record showed a reasonable

probability that Helms would act violently again without treatment, which met the Section 301(b)(1) "insanity acquittees" formulation of clear and present danger to others. *Id.* at 1390. Thus, *Helms* is consistent with our interpretation that Section 301(b)(1) contains three alternative ways to show a person is a clear and present danger to others.

Further, we conclude that when the involuntary commitment is based upon the third means to show a clear and present danger in Section 301(b)(1), *i.e.*, the "threats and acts" formulation, both a threat and an act in furtherance must be proven. This is clear from the plain language of the pertinent portion of Section 301(b)(1), which states "[f]or the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm." 50 P.S. § 7301(b)(1).

First, reading Section 301(b)(1) as a whole, we disagree with the significance the PSP attaches to its use of the word "may" because such a reading ignores the context of Section 301(b)(1). The first sentence of Section 301(b)(1) provides that a "clear and present danger to others **shall be shown**" by proving serious bodily harm and a reasonable probability of recurrence. *Id.* (emphasis added). Its third sentence then provides that "a clear and present danger to others **may be shown**" for those who are incompetent to stand trial or those who have been acquitted for a lack of responsibility. *Id.* (emphasis added). Lastly, its fourth sentence provides that "a clear and present danger of harm to others **may be demonstrated** by proof" of threats of harm and acts in furtherance. *Id.* (emphasis added). Viewing Section 301(b)(1) as a whole, it is clear the legislature used the word "may" to express alternative possibilities for showing a clear and present danger if the serious bodily harm formulation cannot be met. *See Vencil*, 152 A.3d at 244 ("[i]n determining legislative intent, '[s]ections of a statute must be read together and in conjunction with each other, and construed with reference to the entire

statute.'") (quoting *Bd. of Revision of Taxes, City of Phila. v. City of Phila.*, 4 A.3d 610, 622 (Pa. 2010)). Our interpretation is consistent with the *Helms* Court's conclusion that Section 301(b)(1) contains alternative means to show that a person is a clear and present danger to others. *See Helms*, 506 A.2d at 1388.

Second, Section 301(b)(1) is clear that the proof required to meet the "threats and acts" formulation is "proof that the person has made threats of harm **and** has committed acts in furtherance of the threat to commit harm." 50 P.S. § 7301(b)(1) (emphasis added). The use of the conjunction "and" to connect threats and acts in furtherance makes it clear that both are required elements of proof. The PSP's disjunctive reading that a clear and present danger can be shown by threats alone is inconsistent with the statutory language. Additionally, the phrasing "has committed acts in furtherance of the threat to commit harm" is clearly referring back to the previous phrase "the person has made threats of harm," showing that the two phrases are connected and dependent, not independent requirements. *Id.* Finally, the PSP's reading of this sentence as requiring a showing of only a threat of harm would render meaningless and superfluous the acts in furtherance language, which is contrary to the basic tenants of statutory construction. *See* 1 Pa.C.S. § 1921(a) (requiring courts to aim to give effect to all of a statute's provisions); *Commonwealth v. Ostrosky*, 909 A.2d 1224, 1232 (Pa. 2006) (noting the legislature is "presumed not to intend any statutory language to exist as mere surplusage"). Accordingly, we conclude that when an involuntary commitment is based on Section 301(b)(1)'s threats and acts formulation, both a threat of harm to others and an act in furtherance of that threat must be proven.[7]

_____

[7] To be clear, we do not hold that under Section 301(b)(1) an act in furtherance of a threat to harm another person must be shown for all involuntary commitments. *Accord Helms*, 506 A.2d at 1388.

Having concluded that proof of an act in furtherance of the threat to commit harm was necessary, we now turn to the issue of whether B.W.'s communication of his plan to strangle his coworker the next time he saw him was sufficient to prove B.W. committed an act in furtherance. We conclude that the articulation of a specific plan to harm an identified target that is deemed credible by medical professionals is sufficient to prove an act in furtherance of the threat to commit harm.

As noted above, Section 301 contains criteria for when a person is a clear and present danger to oneself or another. Section 301(b)(2)(ii) contains a parallel requirement for an involuntary commitment based on a threat to commit suicide and acts in furtherance of the threat. 50 P.S. § 7301(b)(2)(ii). The Superior Court has held that a person who has developed a complete plan, or taken steps to develop a plan, to commit suicide "has committed acts which are in furtherance of the threat to commit suicide[.]" *See id.* In *Appeal of H.D.*, 698 A.2d 90 (Pa. Super. 1997), the court concluded H.D.'s plan to jump off a bridge was sufficient to support her 302 commitment and rejected H.D.'s characterization of her statement as a mere suicidal "idea" that did not establish intent. *H.D.*, 698 A.2d at 94 n.4. The court explained "[a]fter a thorough review of the record, we refuse to second-guess the conclusion of the emergency medical and mental health professionals that H.D. presented a clear and present danger of harm to herself." *Id.*

Moreover, the Superior Court has held that engaging in the planning process constitutes an act in furtherance of the threat to commit suicide. *See In re R.F.*, 914 A.2d 907, 915-16 (Pa. Super. 2006); *Commonwealth v. Smerconish*, 112 A.3d 1260, 1264 (Pa. Super. 2015). In *R.F.*, the Superior Court affirmed the trial court's order denying R.F.'s petition to expunge because there was sufficient evidence to support the initial 302 commitment. *R.F.*, 914 A.2d at 908. The court rejected R.F.'s argument that he had not taken an "affirmative action" to commit suicide and concluded R.F. was a clear and

present danger to himself because he had "used the internet to access ways to commit suicide, and he phoned a suicide hotline to gather further information on the subject, which we find coalesce to constitute proof in furtherance of [R.F.'s] suicidal ideation." *Id.* at 914. Similarly, in *Smerconish*, the Superior Court affirmed the trial court's order denying Smerconish's petition to expunge because there was sufficient evidence of his suicide threat and an act in furtherance. *Smerconish*, 112 A.3d at 1264. Smerconish sent his sister 12 instant messages threatening suicide and stating he was searching for painless ways to kill himself, which the Superior Court found showed he was severely mentally disabled and in need of treatment. *Id.* at 1263-64. Additionally, the court held that "[h]is online research seeking painless methods of committing suicide constituted an act in furtherance of the threat to commit harm." *Id.* at 1264. From these cases, it is clear that engaging in the planning process by conducting research or expressing a detailed plan constitute acts in furtherance of a threat under the MHPA.

We see no reason to construe the "acts in furtherance" requirement of Section 301(b)(1) differently from that requirement in Section 301(b)(2)(ii). *See Ratzlaf v. U.S.*, 510 U.S. 135, 143 (1994) ("[a] term appearing in several places in a statutory text is generally read the same way each time it appears."). Even B.W. concedes that the development of an exact plan to harm another person is sufficient to show an act in furtherance of a threat for a 302 commitment. B.W.'s Brief at 5, 10. B.W. articulated to his physician a developed, specific plan to kill his coworker, whom he identified, by strangling him the next time he saw him. This plan was fully-formed as it detailed the named target of the threat, the method of carrying out the threat of harm, and the imminence of the threat. Concluding that B.W.'s plan to strangle his coworker is an act in furtherance is consistent with *H.D.*, in which the court held a plan to jump off a bridge was an act in furtherance. *See H.D.*, 698 A.2d at 94 n.4. Further, our conclusion that a

fully-developed plan to harm another is supported by *R.F.* and *Smerconish*, both of which held that conducting research to develop a final plan of how to commit harm was an act in furtherance under the MHPA. *See In re R.F.*, 914 A.2d 907, 915-16 (Pa. Super. 2006); *Commonwealth v. Smerconish*, 112 A.3d 1260, 1264 (Pa. Super. 2015). Significantly, the three physicians who treated B.W. found his threats credible and determined he was in need of immediate treatment. Pursuant to *Vencil*, we accord deference to the physicians, "as the physician examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary." *Vencil*, 152 A.3d at 246; *see also H.D.*, 698 A.2d at 94 n.4 (refusing to question the medical professionals' conclusions).

The Superior Court's holding that B.W.'s actions constituted a mere threat without an act in furtherance was inconsistent with this precedent that the acts of planning and communicating a developed plan to medical professionals is an act in furtherance. Moreover, the Superior Court seemingly read into Section 301 the requirement that an act in furtherance under the MHPA must be overt or tangible. However, the plain language of Section 301 does not contain such a requirement. *Compare* 50 P.S. § 7301(b)(1) (stating a person is a clear and present danger to others if "the person has made threats of harm and has committed acts in furtherance of the threat to commit harm), 50 P.S. § 7301(b)(2)(ii) (providing a person is a clear and present danger to oneself if "the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide), 50 P.S. § 7301(b)(2)(iii) (stating the same requirements for proving self-mutilation), *with* 18 Pa.C.S. § 903(e) (requiring proof of an "overt act in pursuance" for a criminal conspiracy). Because the plain language of the MHPA does not require an overt act in furtherance of the threat, we decline to read

such a requirement into the statute. *See Sivick v. State Ethics Comm'n*, 238 A.3d 1250, 1264 (Pa. 2020) (explaining that a court cannot add language to a statute in its interpretation of the plain language).

## V. CONCLUSION

For these reasons, we conclude that the record contains sufficient evidence to show that B.W. was a clear and present danger to others at the time of the 302 commitment as the physicians' found he made a threat to harm another and committed acts in furtherance of that threat. Accordingly, we reverse the Superior Court's order that the medical records of B.W.'s 302 commitment be expunged and destroyed.

Order reversed. Jurisdiction relinquished.

Chief Justice Baer and Justices Donohue, Dougherty and Wecht join the opinion.

Justice Todd files a concurring and dissenting opinion in which Justice Saylor joins.