2023 PA Super 81

| | | |
|---|---|---|
| IN RE: PETITION OF J.G.F. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: PENNSYLVANIA STATE POLICE | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 925 WDA 2022 |

Appeal from the Order Entered July 12, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CC-22-00082

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McLAUGHLIN, J.

OPINION BY BENDER, P.J.E.:                    **FILED:  May 11, 2023**

The Pennsylvania State Police (hereinafter "PSP") appeals from the orphans' court's July 12, 2022 order granting Appellee's, J.G.F., Petition to Vacate and Expunge Involuntary Civil Commitment Records and Restoration of Rights.  After careful review, we reverse.

The PSP summarizes the pertinent facts and procedural history of this case, as follows:

> On May 3, 2020, J.G.F. was involuntary committed to Western Psychiatric Institute and Clinic (hereinafter "WPIC"), pursuant to section 302 of the Mental Health Procedures Act, 50 P.S. § 7302 (hereinafter "MHPA"), after an examination by Drs. Paul A. Valencia, MD[,] and Xixi Wong, MD[,] at the University of Pittsburgh Medical Center (hereinafter "UPMC") and WPIC, respectively, in Allegheny County, Pennsylvania.
>
> On March 22, 2022, J.G.F., by and through his counsel, filed a Petition to Vacate and Expunge Involuntary Civil Commitment and Restoration of Rights.  In the Petition, J.G.F. generally alleged [that] the evidence upon which the commitment occurred was insufficient and sought expungement of the records regarding his

involuntary commitment pursuant to 18 Pa.C.S. § 6111.1(g)(2) (hereinafter "section 6111.1(g)(2)") and section 113 of the MHPA, 50 P.S. § 7113 (hereafter "section 113 of the MHPA["]). The final paragraph of the Petition requested that the [t]rial [c]ourt "[r]estore to petitioner any and all of his civil rights, which may have been impaired as a result of the aforementioned involuntary commitment."

A hearing was held on July 11, 2022. The PSP entered into evidence the certified record of the involuntary commitment of J.G.F. from May 3, 2020, upon stipulation.

During the hearing[,] J.G.F. testified as to the facts and circumstances surrounding the 302 commitment. No facts or testimony [were] produced about J.G.F.'s current mental stability or ability to possess a firearm without risk of harm to himself or others.

After the close of testimony[, the] PSP argued [that,] pursuant to *In re Vencil*, 152 A.3d 235 (Pa. … 2017)[,] the [t]rial [c]ourt may only review what is contained within the certified 302 record[,] as section 6111.1(g)(2) reviews pose pure questions of law that require no further testimony. [The] PSP further argued that any relief as to the restoration of firearms rights pursuant to section 6105(f) [was] waived because [J.G.F.] failed to cite that authority and specifically plead for relief under that authority. Further, [the] PSP argued that [J.G.F.] provided "absolutely zero testimony … as to why he is no longer a threat of harm to himself or others."

Following the hearing, the [trial court] took the matter under advisement…. On July 12, 2022, the [t]rial [c]ourt signed an order granting expungement of the involuntary commitment and restor[ing] … all civil rights that have been impaired[] as a result of the involuntary commitment. The [t]rial [c]ourt's [o]rder was docketed July 18, 2022.

[The] PSP's [n]otice of [a]ppeal was sent in for filing on August 11, 2022, and docketed August 17, 2022. … [T]he [t]rial [c]ourt entered an [o]pinion dated October 14, 2022, and docketed October 17, 2022.

PSP's Brief at 5-7 (citations to the reproduced record omitted).

In its brief, the PSP presents three issues for our review:

1. Did the trial court commit an error of law and/or abuse its discretion in ordering the expungement of a record of involuntary commitment pursuant to 18 Pa.C.S. § 6111.1(g)(2)[,] where the underlying facts, as recorded in the certified record, were sufficient to warrant an involuntary commitment under the [MHPA]?

2. Did the trial court abuse its discretion in ordering the restoration of firearms rights pursuant to 18 Pa.C.S. § 6105(f) where [J.G.F.] failed to meet his burden in proving [he] was no longer a threat of harm to himself or others?

3. Did the [t]rial [c]ourt commit an error of law in ordering the restoration of firearm rights pursuant to 18 Pa.C.S. § 6105(f) where [J.G.F.] waived such a request for relief by failing to specifically plead for that relief in his original petition?

*Id.* at 4.[1]

Before addressing the PSP's issues, we begin by setting forth the legal framework governing the issues before us in this case. Our Supreme Court has explained:

The legislature enacted Pennsylvania's [MHPA], 50 P.S. §§ 7101–7503, to establish procedures "to assure the availability of adequate treatment to persons who are mentally ill." 50 P.S. § 7102. The MHPA's provisions "shall be interpreted in conformity with the principles of due process to make voluntary and involuntary treatment available where the need is great and its absence could result in serious harm to the mentally ill person or to others." *Id.* One treatment option the MHPA governs is involuntary emergency examination and treatment, commonly referred to as a "302 commitment." *See* 50 P.S. § 7302. Section 302 of the MHPA provides that an involuntary emergency examination of a person may occur upon a physician's certification. 50 P.S. § 7302(b). If the examining physician determines "that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately" and may continue for up to 120 hours. 50 P.S. § 7302(b), (d); *see also* 50 P.S. § 7301(a) (providing a person who

---

[1] We note that J.G.F. did not file an appellee's brief in this case.

is "severely mentally disabled and in need of treatment" may be subject to "involuntary emergency examination and treatment").

Section 301 further provides that a person is "severely mentally disabled" when mental illness causes the person's "capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself[.]" 50 P.S. § 7301(a). Section 301(b)(1) lists the following criteria for showing a person is a clear and present danger of harm to others:

> (b) **Determination of Clear and Present Danger.**--(1) Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. If, however, the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, such 30-day limitation shall not apply so long as an application for examination and treatment is filed within 30 days after the date of such determination or verdict. In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated. For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

50 P.S. § 7301(b)(1).[1]

[1] Section 301(b)(2) contains the criteria for determining that a person is a danger to himself or herself:

(2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:

> (i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there

is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(b)(2).

The Pennsylvania Uniform Firearms Act of 1995 (UFA), 18 Pa.C.S. §§ 6101–6128, makes it unlawful for a person who has been involuntarily committed under Section 302 to "possess, use, control, sell, transfer or manufacture" a firearm or to obtain a license to conduct any of those activities. 18 Pa.C.S. § 6105(a)(1), (c)(4). However, the UFA provides two ways for the subject of a 302 commitment to obtain relief from the Section 6105(a)(1) firearm restrictions. [The first means] is a court-ordered expungement of the 302 commitment record under Section 6111.1(g)(2), which provides:

(g) Review by court.—

* * *

(2) A person who is involuntarily committed pursuant to section 302 of the [MHPA] may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court

- 5 -

shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged. A petition filed under this subsection shall toll the 60-day period set forth under section 6105(a)(2).

18 Pa.C.S. § 6111.1(g)(2).

***In re B.W.***, 250 A.3d 1163, 1165–67 (Pa. 2021) (one footnote omitted).

In this case, the PSP first argues that the orphans' court abused its discretion in finding the evidence insufficient to support J.G.F.'s involuntary commitment. According to the PSP, the court erroneously conducted a *de novo* hearing, and then considered J.G.F.'s testimony at that proceeding in concluding the evidence was insufficient. The PSP insists that our Supreme Court in ***Vencil*** limited a sufficiency review in an involuntary commitment case to the certified record and the facts known to the physicians at the time of the involuntary commitment. Because, here, the court instead considered J.G.F.'s hearing testimony in reaching its decision to expunge his involuntary commitment record, the PSP concludes that the "[c]ourt misapplied the law and committed reversible error." PSP's Brief at 9. For the following reasons, we agree.

"We review the trial court's denial of a motion for expunction for an abuse of its discretion." ***A.M.M. v. Pa. State Police***, 194 A.3d 1114, 1117 (Pa. Super. 2018) (citation omitted).

[Our Supreme] Court clarified the appropriate review of a Section 6111.1(g)(2) petition to expunge a 302 commitment record based on the sufficiency of the evidence to support the 302 commitment in … ***Vencil***…:

Under section 6111.1(g)(2), a challenge to the sufficiency of the evidence to support a 302 commitment presents a pure question of law, and the court's sole concern is whether, based on the findings recorded by the physician and the information he or she relied upon in arriving at those findings, the precise, legislatively-defined prerequisites for a 302 commitment have been satisfied and are supported by a preponderance of the evidence. **We emphasize that the trial court's review is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings**, and requires deference to the physician, as the original factfinder, as the physician examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary.

*Vencil*, 152 A.3d at 246 (rejecting *de novo* review subject to clear and convincing burden of proof for [s]ection 6111.1(g)(2) petitions).

*Genits v. Commonwealth*, No. 191 EDA 2021, unpublished memorandum at *4 (Pa. Super. filed Oct. 8, 2021) (quoting *B.W.*, 250 A.3d at 1167) (emphasis added).

Thus, it is clear that,

[s]ection 6111.1(g)(2) requires judicial review of "the sufficiency of the evidence **upon which the commitment was based**." 18 Pa.C.S.[] § 6111.1(g)(2) (emphasis added). "[T]he evidence upon which the commitment was based" is the information contained in the physician's record of the examination of the individual and the resultant findings. *See* 50 P.S. § 7302(b) (requiring the physician to make a record of the examination and his or her findings). Therefore, the plain language of section 6111.1(g)(2) directs a trial court to review the physician's findings, made at the time of the commitment, to determine whether the evidence known by the physician at the time, as contained in the contemporaneously-created record, supports the conclusion that the individual required commitment under one (or more) of the specific, statutorily-defined circumstances. *See* 50 P.S. § 7301.

***Vencil***, 152 A.3d at 242. "[T]he appropriate standard of proof applicable to the physician's record findings is a preponderance of the evidence standard, which is generally applicable to civil matters and has been classified as 'a more likely than not inquiry,' supported by the greater weight of the evidence; something a reasonable person would accept as sufficient to support a decision." ***Id.*** at 246 (citations omitted).

In the instant case, the orphans' court summarized the evidence presented at the hearing on J.G.F.'s petition to expunge, as follows:

> [J.G.F.] testified that, on May 3, 2020, he had stopped at a convenience store in Monroeville and, while there, purchased and drank [a] blended drink of ice tea and beer. According to [J.G.F.], he became lightheaded from the drink, and, suspecting that the drink may have been tainted, he requested and received a ride from Monroeville Police to UPMC East Hospital for drug testing. At some point after arriving at the hospital emergency room, [J.G.F.] made a request to use a restroom. That request was answered by a directive from two UPMC police officers that [J.G.F.] remain in the emergency room and use a urinal bottle. [J.G.F.] complied, but asserts that, as he did so, the officers "started laughing at me really hard." [J.G.F.] reacted by throwing the container at one of the police officers and, as the second officer approached, striking that officer. [J.G.F.] avers, however, that the contact with the second officer was accidental. Following the outburst, [J.G.F.] was sedated, placed in restraints, and transported to UPMC Western Psychiatric Hospital ("WPIC"), where he remained for three days. The report entered by the referring physician at UPMC East Hospital described [J.G.F.] as "delusional, possibly paranoid, believing someone is poisoning his beer, that someone killed his dog and raped his girlfriend[."] The report stated that [J.G.F.] "threw urine at staff and [was] physically and verbally abusive[,"] and that [J.G.F.] "likely will require inpatient treatment, including medication and therapy."
>
> At WPIC, [J.G.F.] was examined by Dr. Xixi Wong. Dr. Wong found [J.G.F.] to be "calm and cooperative" and stated that [J.G.F.] understood the patients' rights which were recited to him.

The justification entered for involuntary treatment was "an acute medical crisis in the emergency room." The proposed course of treatment was "further evaluation, treatment and stabilization." [J.G.F.] has testified, that, apart from an initial injection of Haldol administered at UPMC East Hospital, he received no treatment at either facility: "No medication. No nothing. I was released after 72 hours." [J.G.F.] testified that he met with a doctor at WPIC only twice, upon admission and at discharge.

Trial Court Opinion (TCO), 10/17/22, at 3-4 (citations to the record omitted).

Ultimately, the court determined that J.G.F.'s "own testimony set forth a credible account of events which asserted that his outburst at the UPMC East facility had resulted from the humiliation of being observed and laughed at as he was compelled to urinate publicly into [a] container." *Id.* at 4. In rejecting the PSP's allegation that the evidence was sufficient to support J.G.F.'s involuntary commitment, the court explained:

A difficulty with the [PSP's] contention that the certified record provides sufficient evidence to have warranted an involuntary commitment pursuant to [s]ection 302 of the [MHPA] is that **[J.G.F.] has testified that, although he was referred to WPIC, little was provided at that facility by way of examination or treatment: "they took me at 6:30 in the morning to [WPIC] and I was there for three days. No medication. No nothing. I was released after 72 hours[."]** Consistent with [J.G.F.'s] assertion, an examination of the WPIC record discloses that [J.G.F.] understood the rights explained to him, and indicates no course of further treatment.

Contrary to the contention made by the [PSP] during cross-examination that [J.G.F.] had asserted that "everything in the 302 is just incorrect[," J.G.F.] acknowledged that he had responded in an aggressive manner toward the UPMC police, throwing the container of urine toward them. [J.G.F.] acknowledged the conduct that had precipitated the 302 referral and **the account of events as described by [J.G.F.] were found to be credible. Given that account of events**, and the sparse WPIC record, it was determined that the evidence upon which the involuntary commitment was based was insufficient.

- 9 -

*Id.* at 5 (emphasis added).

It is obvious from the emphasized language of the court that, in assessing the sufficiency of the evidence to support J.G.F.'s involuntary commitment, it considered his testimony at the hearing on his petition to expunge. From that testimony, which the court found credible, it concluded that his involuntary commitment was unnecessary based, at least in part, on his statements that he was not thoroughly examined or provided any treatment during his 72-hour commitment. Because the orphans' court clearly did not limit its review to the facts known to the physicians at the time they ordered J.G.F.'s involuntary commitment, the court abused its discretion in finding the evidence insufficient to support his involuntary commitment.

Instead, we agree with the PSP that the information contained in the physicians' records of their examinations of J.G.F. and their resultant findings were sufficient to support his involuntary commitment by a preponderance of the evidence. As the PSP summarizes:

> In looking at the certified record, PSP Exhibit A ([reproduced record] 35-55), as required under **Vencil**, it is clear that sufficient evidence existed for an involuntary commitment. The first section 302 application at UPMC was made because [J.G.F.] was unable to care for himself unless adequate treatment was afforded to him. The application states that [J.G.F.] was brought to UPMC East by EMS because of his belief that someone had poisoned his water and his demand to speak to police. It further states [J.G.F.] stated someone had killed his dog and raped his girlfriend. It also states that he threw urine and became physically combative with staff requiring restraints. Dr. Paul A. Valencia found [J.G.F.] to be "delusional," "paranoid," and a "potential harm to others as he threw urine at staff and [was] physically and verbally abusive." Dr. Valencia ultimately found [J.G.F.] severely mentally disabled

and in need of treatment by checking box A on Part VI Physician's Examination of the certified record.

Once transferred to WPIC, [J.G.F.] was re-evaluated by Dr. Xixi Wong. Dr. Wong checked a box indicating that [J.G.F.] was in an acute medical crisis in the emergency room justifying the need for involuntary treatment. Dr. Wong further noted that [J.G.F.] was "calm, cooperative, states that he is on 302 [because] he wanted covid testing" and needed "acute inpatient psych admission for further evaluation, treatment and stabilization." Dr. Wong ultimately also found the [J.G.F.] to be severely mentally disabled and in need of treatment by checking box A on Part VI Physician's Examination of the certified record.

Two separate physicians at two separate facilities examined the [J.G.F.] and found him to be in need of involuntary treatment. Each physician's decision must be afforded great deference due to their experience and training. It is clear through their observations that [J.G.F.] was in the midst of a mental health crisis evidenced by his delusional and paranoid thoughts concerning someone poisoning his water, killing his dog, and raping his girlfriend. Further, he did not understand why he was being 302'd at UPMC, evidenced by him telling the doctor at WPIC [that] the 302 was based on [J.G.F.'s] desire to have covid testing. Additionally, [J.G.F.] also became physically combative and verbally abusive to the officers and security at UPMC and even threw urine on them. [J.G.F.'s] actions meet the definition of being severely mentally disabled because his actions and thoughts show his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or himself.

PSP's Brief at 14-16.

According the appropriate deference to the two physicians who examined J.G.F., we conclude that the preponderance of the evidence supports their decisions that he was having a mental health crisis that impaired his "capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal

needs[,]" such that he posed "a clear and present danger of harm to others or to himself[.]" 50 P.S. § 7301(a). Thus, we reverse the orphans' court's order granting J.G.F.'s petition to expunge the record of his involuntary commitment and reinstating his civil rights that were impaired by that commitment.[2]

Order reversed. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2023

---

[2] Based on our disposition, we need not address PSP's remaining two issues.