J-A29003-23

2024 PA Super 95

| IN RE: M.A.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.A.C. | : | No. 373 WDA 2023 |

Appeal from the Order Entered March 3, 2023
In the Court of Common Pleas of Butler County Civil Division at No(s):
MAD 2022-40326

BEFORE:  BOWES, J., KUNSELMAN, J., and MURRAY, J.

DISSENTING OPINION BY KUNSELMAN, J.:          **FILED: May 13, 2024**

I believe there was insufficient evidence to support an involuntary 302 commitment of M.A.C., and I would reverse the order denying his petition under the Uniform Firearms Act, 18 Pa. C.S.A. § 6111.1(g)(2), to expunge the record of that commitment.  In denying M.A.C.'s expungement petition, the trial court deferred to the doctor's conclusion that M.A.C. needed inpatient treatment, without examining the facts upon which that conclusion was based. Trial Court Findings of Fact and Conclusions of Law, 3/3/23, at 3-4.  The trial court did not indicate whether M.A.C. posed a threat of harm to himself or others; it only upheld the commitment as being medically necessary.  The majority affirms that decision.  It concludes the evidence was sufficient to support the commitment, because M.A.C. posed a threat of harm to himself. For the reasons that follow, I respectfully dissent.

In his first issue, M.A.C. challenges the sufficiency of the evidence to support his involuntary commitment under the Mental Health Procedures Act (MHPA), 50 P.S. §§ 7101-7502.  Significantly, to support an involuntary

commitment under section 302 of the MHPA, there must be sufficient evidence that the patient posed a clear and present danger to others or himself as outlined in section 301 of the Act. 50 P.S. §§ 7301(b), 7302(b).

Regarding danger to others, the MHPA requires evidence that within the past 30 days: "the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated." 50 P.S. § 7301(b)(1). Alternatively, a clear and present danger of harm to others may be demonstrated by proof "that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm." *Id.*[1]

Regarding danger of self-harm, the MHPA requires evidence that within the past 30 days one of the following three scenarios occurred:

> (i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury

---

[1] There is a third basis to support a finding of clear and present danger to others not relevant here. Namely, when the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another. 50 P.S. § 7301(b)(1). In such cases, the statute provides that the 30-day limitation shall not apply so long as an application for examination and treatment is filed within 30 days after the date of such determination or verdict. *Id.* In such case, a clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that the conduct will be repeated. *Id.*; *see also Commonwealth v. Helms*, 506 A.2d 1384, 1388-91 (Pa. Super. 1986).

or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 Pa.C.S.A. § 7301(b)(2).

If a physician determines that a patient poses a threat of harm to himself or others and needs treatment, the criteria for involuntary commitment under section 302 are met, and treatment may be started immediately. *Id.* at § 7302(b).

Preliminarily, as the majority notes, our standard of review for a sufficiency challenge of a 302 commitment is *de novo*. *In re Vencil*, 152 A.3d 235, 246 (Pa. 2017). Our Supreme Court stated:

under section 6111.1(g)(2), a challenge to the sufficiency of the evidence to support a 302 commitment presents **a pure question of law**, and the court's sole concern is whether, based on the findings recorded by the physician and the information he or she relied upon in arriving at those findings, the precise, legislatively defined prerequisites for a 302 commitment have been satisfied and are supported by a preponderance of the evidence.

J-A29003-23

*Id.* (emphasis added).[2]

The scope of review for both the trial court and the appellate court is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings. *Id*. There is no *judicial* record of the 302 decision for the courts to review.[3] *Id.* at 244. The examining doctor acts as the factfinder to determine whether there are sufficient facts to

_____

[2] The MHPA does not provide specifically for a direct appeal to a 302 commitment. However, it provides generally that "Actions requesting damages, declaratory judgment, injunction, mandamus, writs of prohibition, habeas corpus, including challenges to the legality of detention or degree of restraint, and any other remedies or relief granted by law may be maintained in order to protect and effectuate the rights granted under this act." 50 P.S. § 7113.

Additionally, as M.A.C. does here, a 302 commitment can be challenged after the fact by filing a petition to expunge the record, under the Uniform Firearms Act, 18 Pa.C.S.A. § 6111.1(g)(2). The pertinent part of this statute provides:

> A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged.

18 Pa.C.S.A. § 6111.1(g)(2).

[3] The courts are not involved in the emergency application for treatment under 302; instead, under the MHPA, the application is filed with the County Mental Health Administrator or his/her delegate, who reviews the application and, if approved, issues a warrant to transport the patient to a hospital or treatment facility for evaluation. 50 P.S. § 7302(a)(1). Alternatively, upon personal observation of Section 301 behavior, any physician, police officer or other authorized person may have the patient transported to an approved facility for examination without a warrant. 50 P.S. § 7302(a)(2).

- 4 -

indicate that patient is severely mentally disabled and in need of treatment. **See** 50 P.S. § 7302(b) ("A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301(b)[1] and in need of immediate treatment."). The MPHA requires the physician to "make a record of the examination and his findings." **Id.** "If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately." **Id.** Based on this procedure, the only record to review from a 302 commitment is the physician's written record of his or her examination and findings.[4] **Vencil**, 152 A.3d at 244.

---

[4] The court only becomes involved in an involuntary commitment if the patient requires treatment beyond the initial 120-hour period authorized by section 302. Prior the expiration of 120 hours, if the patient does not agree to continued voluntary treatment under section 202, the facility must file a section 303 certification with the court of common pleas. 50 P.S. §§ 7302(d), 7303(a).

> "Upon receiving such application, the court of common pleas shall appoint an attorney who shall represent the person unless it shall appear that the person can afford, and desires to have, private representation. Within 24 hours after the application is filed, an informal hearing shall be conducted by a judge or by a mental health review officer [MHRO] and, if practicable, shall be held at the facility."

50 P.S. § 7303 (b).

> At the conclusion of the review, if the judge or the review officer finds that the person is severely mentally disabled and in need of continued involuntary treatment, either as an inpatient or through less restrictive assisted outpatient treatment, he shall so certify. Otherwise, he shall direct that the facility director or his designee discharge the person."

*(Footnote Continued Next Page)*

Finally, as with any sufficiency challenge, we must review the facts of record in the light most favorable to the original decision maker or prevailing party (if applicable) to determine whether the requisite standard has been met. *Id.* at 243. Deference to the facts as found by the original factfinder is of particular importance where the factfinders have specialized training or knowledge that makes them uniquely qualified to reach the findings and conclusions the General Assembly has entrusted them to make. *Id.* For a 302 commitment, courts review the facts in the light most favorable to the physician, as the original factfinder, "who examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and [who] has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary." *Id*. at 246.

By way of additional background, an application for a 302 commitment must be made on a form issued and approved by the Pennsylvania

_____

50 P.S. § 7303(c)(1).

The MPHA requires section 303 hearings to be recorded, and the recording to be kept for one year. 50 P.S. § 7303(c)(2). It further lists the documents that must be included in the certification. 50 P.S. § 7303(d). If the section 303 hearing occurred before a MHRO, the person may petition for review of the certification by the court of common pleas, and a hearing must be held within 72 hours. 50 P.S. § 7303(g).

A 303 commitment authorizes treatment for an additional 20 days, after which a similar process may be followed under section 304 to authorize an additional 90 days of treatment (or up to one year in some circumstances). 50 P.S. 7303(h), 7304 (a)-(g). If continuing treatment is required beyond those 90 days, section 305 allows the court, upon application and a hearing, to order additional treatment periods in 180-day intervals. 50 P.S. § 7305 (a)-(c).

Department of Human Services. 55 Pa. Code § 5100.23. The standard form for a 302 Application is seven pages and has six parts. *See* Form MH-781-A. Only Parts I and VI are relevant to this type of sufficiency challenge.[5] Part I is completed by the petitioner, who makes the initial request to have a patient involuntarily committed for evaluation and treatment. The first line of this part requires the petitioner to identify the patient whom the petitioner believes is severely mentally disabled. The form provides four possible boxes for the petitioner to check to indicate how the patient poses a clear and present danger to others or himself/herself and instructs the petitioner to check all boxes that apply. There is one box to allege harm to others and three boxes to allege self-harm.[6]

_____

[5] Part II is completed when transporting the patient to a medical facility without a warrant from the County Administrator and may be used in emergency situations when the Administrator or his/her delegee gives approval by phone. Part III is the Warrant. This is completed by the County Administrator after reviewing Part I of the petition; if the warrant issued, it authorizes the patient to be transported against their will to a designated facility to be examined and if necessary, to be admitted for up to 120 hours. (Neither Parts II nor Part III is necessary when a physician or police officer personally observes the 301 behavior; in such situations, those individuals check Box B on Part I of the form, arrange transportation by ambulance, police car, or other means, and directly request the facility to examine the patient. *See* footnote 4, *supra*). Part IV verifies that the patient was informed of his or her legal rights as described in Form MH 783-A. Part V identifies actions taken to assure that while the patient is detained, the health and safety needs of any of his/her dependents are met and that his/her personal property and the premises he/she occupies are secure.

[6] The three boxes for self-harm set forth the criteria outlined in section 301(b)(2), set forth *supra*.

On the next page, the form provides space to document the behavior necessitating the Application. A supplemental page is also available if the petitioner needs more space. The form directs the petitioner to "Describe in detail the specific behavior within the last 30 days which supports your belief (include location, date and time whenever possible, and state who observed the behavior)." ***Id.***

Part VI of the Application is completed by the examining physician. The form provides a space for the physician to document his or her findings. It states, "Describe your findings in detail. Use additional sheets if necessary." ***Id.***

Turning to the 302 Application that M.A.C. challenges in this case, Part I was completed by police officer Donald E. Myers, Jr., who, within a two-hour period, twice responded to calls for help apparently made by M.A.C. Officer Myers only checked the box on the form indicating he believed M.A.C. posed a clear and present danger to others. Notably, the officer did not check any of the three boxes indicating a belief that M.A.C. posed a threat of harm to himself.

In the narrative portion of the Application, Officer Myers wrote:

> I was dispatched to the residence for persons inside residence. After checking exterior, then entrance, and finding nothing, it was found the subject hasn't slept in [three] days and hearing voices. Subject had HDAD [*sic*], and very paranoid. House complete mess, doors and stairways barricaded with furniture. Responded two hours later. Still hearing voices and suspect inside residence. After negotiating for 45 [minutes], finally made entry, and once again found nothing. Kitchen area completely filthy with dirty dishes and pots over a week old. Found approximately 20 cases

of water and 10 to 15 emergency meal buckets about the house. Due to the individual, barricading exits with furniture, the children, [seven]-year-old boy, [eight]-year-old girl, would not be able to exit residence. At one point [the] children were locked inside a bedroom closet. While [Children and Youth Services] caseworkers were speaking with a [M.A.C.], the [seven-year-old] boy nearly knocked[7] the couch onto himself.

Application for Involuntary Emergency Examination and Treatment, 4/1/22, at 2-3.

Part VI of the Application was completed by the Emergency Room Physician, Dr. Alyssa Tomsey, who examined M.A.C. at Butler Memorial Hospital. When asked to describe her findings in detail, Dr. Tomsey wrote on the first line: "Paranoid" and on the second line: "Auditory Hallucinations." *Id.* at 7. Dr. Tomsey did not identify or describe any actual harm, attempted harm, or threats of harm to others by M.A.C.

In his expungement petition, M.A.C. claims that this evidence was is insufficient to support a 302 commitment. I agree. I believe the doctor's factual findings in this Application fall woefully short of "the legislatively defined prerequisites for a 302 commitment." *Vencil*, 152 A.3d at 246. There are simply no allegations from the petitioning police officer and no observations by the examining doctor to indicate that M.A.C. inflicted or

---

[7] At the expungement hearing, counsel for M.A.C. indicated he believed the word on the form was rocked, not knocked. The form is hand-written, and some words are difficult to read.

attempted to inflict any serious bodily harm or that he made threats of harm to others.

The only issues the policeman documented were that the "house [was a] complete mess" and the "kitchen was completely filthy with dirty dishes and pots over a week old." But a dirty house does not warrant a 302 commitment. The officer also noted an unusual amount of emergency food and water were present. Again, people are free to stockpile food and water. Finally, the officer documented that the exits were blocked with furniture such that the children could not exit; and at one point the children were locked inside a bedroom closet. These facts are certainly abnormal and may have raised questions concerning the safety of the children, which justified Children and Youth Services being called to investigate. However, these facts do not indicate that M.A.C. inflicted harm, attempted to harm, or threatened serious bodily harm to his children or anyone else, which is required to support a 302 commitment.

The MHPA and our caselaw require more than general findings of paranoia and auditory hallucinations. At a minimum, where there is no actual or attempted physical harm, a 302 commitment requires facts that indicate a credible threat of harm and an act in furtherance of that threat. *See In re B.W.* 250 A.3d 1163, 1175 (Pa. 2021).

In *B.W.*, for example, our Supreme Court upheld a 302 commitment where a person made credible threats of harm against a co-worker. B.W.

went to his primary care physician because he was experiencing anxiety and made threats of violence against a co-worker. *Id.* at 1168. During his examination of B.W., the doctor initiated a 302 Application and completed Part I of the form. As the petitioner, the doctor checked the box indicating he believed BW was severely mentally disabled, because he posed a clear and present danger to others. *Id.* In the narrative portion of the form, the petitioning doctor described the following details that supported his belief: "I, Dr. Sumereau, was present, while the patient stated that he would strangle another person to death. He then gave the name of the intended victim. Patient stated that he was not sure when or where he would perform this act, but he would do it the next time he saw the person." *Id.* (citing the Application for Involuntary Emergency Evaluation and Treatment, 9/6/18, at 3).

B.W. was then transferred to the hospital, where the examining physician filled out Part VI of the 302 Application. In describing her findings, the physician noted, "[B.W.] is homicidal toward his coworker, and admits to stating that he would strangle him. B.W. is very angry and agitated, danger to others. Not receptive to voluntary admission." *Id.* (citing the 302 Application at 7). The examining doctor recommended admission to the facility for up to 120 hours of treatment. B.W. was admitted and released after 72 hours. *Id.*

A few weeks later, B.W. filed a petition to expunge his mental health record. Although he did not cite Section 6111.1(g)(2), the court treated the

petition as such. *Id.* at 1168-69. Following a hearing, the trial court denied B.W.'s request. Applying the Supreme Court's holding in *Vencil*, the trial court found "that the evidence known by the physician at the time, as contained in the contemporaneously-created record, supports the conclusion that [B.W.] presented a clear and present danger to others, requiring a 302 commitment." *Id.* at 1169.

The Superior Court reversed, because although B.W. made a threat against the co-worker, "the threat itself, without more does not constitute an act in furtherance of the threat." *Id.* at 1170.

The Supreme Court reversed the Superior Court. First, it agreed that proof of an act in furtherance of the threat to commit harm was necessary for a 302 commitment.[8] *Id.* at 1175. However, it concluded that engaging in the planning process by conducting research or expressing a detailed plan constitute acts in furtherance of a threat under the MHPA. *Id.* at 1176. In examining the actions of B.W., the High Court observed that "B.W. articulated to his physician a developed, specific plan to kill his co-worker, whom he identified, by strangling him the next time he saw him. This plan was fully formed as it detailed the named target of the threat, the method of carrying out the threat of harm, and the imminence of the threat." This was sufficient

---

[8] The Court clarified that an act in furtherance of a threat to harm another person is not necessary for all involuntary commitments. *Id.* at 1175. Earlier in the opinion the court observed that there are three alternative means of establishing a clear and present danger to others. *See id.* at 1173.

- 12 -

proof of an act in furtherance of the threat. ***Id.*** Significantly, the court also observed that the "physicians who treated B.W. found his threats credible and determined that B.W. was in need of immediate treatment." ***Id.***

Here, by contrast, the police officer and the examining physician did not document that M.A.C. made a threat of harm to his children or anyone else. There are no facts that within the past 30 days, M.A.C. "inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated." 50 P.S. § 7301(b)(1). Additionally, there are no facts that M.A.C. "has made threats of harm and has committed acts in furtherance of the threat to commit harm." ***Id.*** As such, the record does not contain sufficient evidence to support a finding that M.A.C. posed a threat of harm to others.

Notwithstanding that the petition only alleged M.A.C. posed a threat of harm to others, the majority opines that the evidence was sufficient to show that M.A.C. posed a threat of harm to himself. Initially, majority concludes the examining doctor is not bound by the box checked by the petitioner, but instead, is free to determine whether the patient poses a clear and present danger of harm to others or to himself under any applicable sections of the MPHA. Majority at *9. I agree. Section 302(b) of the MHPA provides that the physician shall examine the patient "to determine if the person is severely mentally disabled within the meaning of section 301(b)." 50 P.S. §7302. Because section 301(b) encompasses (b)(1) (harm to others) and (b)(2)(i)-

(iii) (harm to self), the physician's examination extends to all parts of 301(b), and is not limited to the box(es) checked in Part I of the Application.

The majority then concludes that the evidence here was sufficient to support the conclusion that M.A.C. posed a threat of harm to himself. Majority at *9-10. On this point, I disagree. Neither the police officer nor the doctor indicated that M.A.C. posed a threat of harm to himself. Aside from "paranoid" and "auditory hallucinations," the doctor made no other findings.

Somehow the majority reads into these three words that the criteria for the first scenario of self-harm under section 301(b)(2)(i) of the MPHA were met, *i.e.* that M.A.C. "would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded" under this Act. Majority at *10. I cannot make this leap.

The serious deprivations of liberty authorized by the MHPA demand that such deprivations be justified through strict compliance with statute's substantive and procedural requirements. **In re S.M.**, 176 A.3d 927, 939 (Pa. Super. 2017). Considering both Parts I and VI of the 302 application (which is all the evidence we have to conduct our *de novo* review), nothing indicated that M.A.C. suffered from a lack of nourishment, hydration, or shelter. Nothing indicated that M.A.C. was neglecting serious medical treatment, or

- 14 -

that he was unable to safely complete the activities of daily living, e.g. cooking without starting a fire. *See e.g. In re S.B.*, 777 A.2d 454, 458 (Pa. Super. 2000) (section 301(b)(2)(i) met where patient refused to take her medication for depression and anxiety; refused meals; her hygiene was poor; and she was unable to approach the staff for help if she felt suicidal). The doctor did not identify any life-threatening safety risks that would necessitate immediate medical intervention. The doctor did not indicate that M.A.C.'s blocking doors or stairs posed a "risk of harm to self," such that "death, serious bodily injury or serious physical debilitation would ensue within 30 days" if treatment was not provided, as required under the MPHA. 50 P.S. §7301(b)(2)(i). On my review of the record before us, I cannot conclude that M.A.C.'s behavior met the requirements for an involuntary commitment under the MPHA.

Whether it would be good public policy to allow the commitment of individuals who are paranoid and hearing voices, without more, is not this Court's place to say; regardless, the legislature unmistakably required more. *See In re B.W.*, 250 A.2d at 1179 (Todd, C.J. dissenting, noting it is not the courts' place to decide public policy regarding involuntary commitments).

While I do not believe an examining doctor needs to use the precise language set forth in the MHPA, the doctor must detail his or her factual findings on Part VI of the 302 Application with enough specificity to identify the 301 behavior at issue. These findings must identify some actual or attempted serious bodily harm committed by the patient; observations of

credible threats of harm; or examples of behavior to show why the patient cannot satisfy their personal needs such that death, serious bodily injury, or serious physical debilitation will ensue if not treated promptly. *See, e.g.*, *In re J.G.F.,* 295 A.3d 265, 272 (Pa. Super. 2023) (upholding 302 commitment where doctor found patient "to be 'delusional,' 'paranoid,' ***and a 'potential harm to others as he threw urine at staff and [was] physically and verbally abusive.'***") (emphasis added). [9] *See also B.W.*, 250 A.3d at 1168 (upholding 302 commitment where doctor wrote that the patient was "homicidal toward his coworker, and admits to stating that he would strangle him," and the patient was "very angry and agitated, danger to others."); *In re R.F.*, 914 A.2d 907, 911 (Pa. Super. 2006) (upholding 302 and 303 commitment where petitioning officer indicated that appellant called crisis hotline, asked them how to commit suicide because he wanted to get it right, told them not to send anyone because they would not get inside, and stated he has a loaded rifle and he is going to use it, and examining physician noted "suicidal ideations" and appellant needed "protection from self" on 302

---

[9] I also believe the petitioner should identify with particularity the behaviors necessitating the need to seek an involuntary commitment on Part I of the 302 Application. *See, e.g.*, *B.W*., 250 A.3d at 1168) (where the petitioning doctor wrote on Part I that he "was present while patient stated he would strangle another person to death" the next time patient saw the person, and patient gave the name of the intended victim.) Such details give the examining doctor background information to use in his or her examination of the patient when assessing whether a 302 commitment is necessary.

Application); ***Commonwealth v. Smerconish,*** 112 A.3d 1260, 1264, 1267 (Pa. Super. 2015) (upholding 302 commitment where trial court relied only on the 302 paperwork that indicated appellant sent his sister twelve instant messages about committing suicide and researched painless ways of committing suicide on internet).

In sum, the record before us is completely devoid of any evidence that M.A.C. posed "a clear and present danger to himself or others" as those terms are defined by the MPHA. Although I believe M.A.C. ***voluntarily*** should have sought treatment for his mental health conditions, this is a separate question from whether he met the requirements for ***involuntary*** treatment under the MHPA. Because I do not believe the evidence supported an involuntary commitment, I dissent.[10]

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/13/2024

---

[10] Because I would grant relief on M.A.C.'s first appellate issue, I make no comment on his remaining two issues.